[959 NE2d 463, 935 NYS2d 526]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v SHAHID MUHAMMAD, Appellant.

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v GREGORY HILL, Appellant.

Argued September 13, 2011; decided October 20, 2011

## POINTS OF COUNSEL

*Law Office of Thomas J. Eoannou*, Buffalo (*Jeremy D. Schwartz* of counsel), for appellant in the first above-entitled action. I. The jury's verdict, finding defendant guilty of count two, assault in the first degree, and not guilty of count three, criminal possession of a weapon in the second degree, was repugnant. (*People v Tucker*, 55 NY2d 1; *People v Loughlin*, 76 NY2d 804; *People v Williams*, 87 AD2d 876; *People v Bennette*, 23 AD3d 489.) II. The trial court erred in denying defendant's motion for authorization and use at trial of an expert witness on the issue of eyewitness identity. (*People v Lee*, 96 NY2d 157; *People v LeGrand*, 8 NY3d 449; *People v Abney*, 13 NY3d 251.)

*Frank A. Sedita, III, District Attorney*, Buffalo (*Michelle Cianciosa, J. Michael Marion* and *Donna A. Milling* of counsel), for respondent in the first above-entitled action. I. The verdict was not repugnant. (*People v Tucker*, 55 NY2d 1; *People v Williams*, 87 AD2d 876.) II. The court properly exercised its discretion in denying defendant's application for an expert on identification. (*People v Lee*, 96 NY2d 157.)

*Legal Aid Bureau of Buffalo, Inc.*, Buffalo (*Nicholas T. Texido, David C. Schopp* and *Barbara J. Davies* of counsel), for appellant in the second above-entitled action. I. The jury's verdict was repugnant where appellant was convicted of intentionally striking the victim with a hammer but acquitted of possessing the hammer with unlawful intent. (*People v Tucker*, 55 NY2d 1; *People v Afrika*, 291 AD2d 880; *People v Haymes*, 34 NY2d 639; *People v Sackes*, 11 AD3d 364; *People v Smith*, 235 AD2d 558; *People v Brewer*, 186 AD2d 88; *People v Cole*, 35 AD3d 911.) II. The court erred in denying suppression of appellant's statements made to police after officers unlawfully entered his home without a warrant, exigent circumstances, or consent. Further, the court erred in refusing to suppress bloody sheets found in appellant's hallway. (*Payton v New York*, 445 US 573; *People v Burr*, 70 NY2d 354; *Wong Sun v United States*, 371 US 471; *Nix v Williams*, 467 US 431; *People v Wood*, 31 NY2d 975; *People v Vennor*, 176 AD2d 1217; *People v Mealer*, 57 NY2d 214.)

*Frank A. Sedita, III, District Attorney*, Buffalo (*Michael J. Hillery* and *Donna A. Milling* of counsel), for respondent in the second above-entitled action. I. The verdict was not repugnant. (*People v Tucker*, 55 NY2d 1; *People v Sackes*, 11 AD3d 364, 4 NY3d 748; *People v Haymes*, 34 NY2d 639.) II. The court was correct in denying suppression of defendant's statements to

police. (*People v Hallman*, 92 NY2d 840; *People v Molnar*, 98 NY2d 328.)

### OPINION OF THE COURT

GRAFFEO, J.

The primary issue in these appeals is whether the jury verdicts convicting defendants of assault but acquitting them of criminal possession of a weapon are legally repugnant. For the reasons that follow, we hold that the verdicts are valid.

I

*People v Muhammad:*

Defendant Shahid Muhammad was indicted for attempted murder in the second degree (Penal Law §§ 110.00, 125.25 [1]), assault in the first degree (Penal Law § 120.10 [1]) and criminal possession of a weapon in the second degree (Penal Law § 265.03 [1] [b]) for allegedly shooting another man several times during a street altercation. The victim, who had known Muhammad for years prior to the shooting, was the only eyewitness. Before trial, defense counsel sought permission to introduce expert testimony on the topic of eyewitness identifications. The trial court denied the request on the basis that the jurors were capable of evaluating the victim's opportunity to observe the shooter and weigh the significance of his initial failure to identify the gunman to police.

At the conclusion of proof, the judge charged the jury that Muhammad could be convicted of first-degree assault if he "caused serious physical injury to [the victim] by means of a deadly weapon, and that he did so with an intention to cause such serious physical injury" to the victim. On the count of second-degree weapon possession, the jury was instructed that the People had to prove that Muhammad "possessed a loaded firearm. Two. That he did so knowingly. Three. That the gun was operable. Four. That he possessed this firearm with the intent to use it unlawfully against" the victim.

After deliberation, the jury acquitted Muhammad of attempted murder and second-degree weapon possession but found him guilty of first-degree assault. Before the jury was discharged, defense counsel objected to the verdict on the ground that the weapon possession acquittal was repugnant to the conviction for assault. The trial court rejected that argument, stating that the jury was allowed to infer that Muhammad

"possessed the gun without a criminal intent, or an intent to use it unlawfully earlier in the evening prior to deciding to shoot" the victim.

The Appellate Division affirmed (66 AD3d 1332 [4th Dept 2009]), holding that the verdict was not repugnant because the trial court's instructions " 'did not preclude the jury from concluding that defendant initially possessed the loaded pistol without intending to use it unlawfully against another, but decided to fire the gun at [the victim] as events unfolded' " (*id.* at 1333, quoting *People v Afrika*, 291 AD2d 880, 881 [4th Dept 2002], *lv denied* 98 NY2d 648 [2002]).

A Judge of this Court granted defendant leave to appeal (13 NY3d 940 [2010]).

*People v Gregory Hill*:

Defendant Gregory Hill was indicted for assault in the second degree (Penal Law § 120.05 [2]) and criminal possession of a weapon in the third degree (Penal Law § 265.02 [1]) for allegedly hitting an acquaintance in the head with a hammer after he became angry when the contents of an ashtray and beer were spilled on his couch. Prior to jury deliberations, the trial court instructed the jurors that to convict Hill of second-degree assault, they had to find that he "caused physical injury to [the victim] by means of a dangerous instrument; and, two, that the Defendant did so with the intent to cause physical injury" to the victim. On the count of third-degree weapon possession, the jurors were charged that the People had to prove that "Hill possessed a hammer; two, that the Defendant did so knowingly; and, three, that the Defendant did so with intent to use such hammer unlawfully against another."

The jury subsequently issued two notes indicating that their deliberations had resulted in a deadlock and the trial court responded with *Allen* charges. The jury ultimately found Hill not guilty of third-degree weapon possession but guilty of second-degree assault. Before the jury was discharged, defense counsel objected to the verdict on repugnancy grounds, claiming that Hill could not have intentionally assaulted the victim with a hammer unless he also possessed the hammer with the intent to use it unlawfully against the victim. The trial court disagreed, denied the motion and discharged the jury.

In affirming the judgment (70 AD3d 1487 [4th Dept 2010]), the Appellate Division concluded that the verdict was not repugnant because the trial court's charge did not preclude the

jury from deciding that Hill did not have an intent to use the hammer unlawfully when he initially possessed it. The court found Hill's other arguments to be meritless.

A Judge of this Court granted Hill leave to appeal (15 NY3d 774 [2010]).

## II

Defendants contend that the verdicts were legally repugnant because it is impossible to intentionally injure a person with a weapon that a jury has found the accused did not possess with the intent to use unlawfully. Their argument is focused on the intent elements of assault and weapon possession, claiming that it is inconsistent for a jury to find that a defendant did not possess a weapon with an intent to use the weapon unlawfully against another person and, at the same time, determine that a defendant intended to inflict serious physical injury with the weapon. The People, in contrast, adopt the rationale of the Appellate Division and claim that the jury instructions in these cases allowed the jurors to consider the state of mind of the accused at the time the weapon was initially possessed or acquired and before the formation of an intent to use it unlawfully against another.

The issue of repugnant verdicts has long been grappled with by the courts in our nation (*see e.g. Dunn v United States*, 284 US 390 [1932, Holmes, J.]). The U.S. Supreme Court settled this question for federal courts when it unanimously held that the Federal Constitution does not prohibit a jury from rendering a verdict that is inherently inconsistent (*see e.g. United States v Powell*, 469 US 57, 63 [1984], citing *Harris v Rivera*, 454 US 339, 346 [1981] [a jury has the "unreviewable power . . . to return a verdict of not guilty for impermissible reasons"]). The Supreme Court has further declined to address repugnancy under its supervisory powers over the federal criminal process because, among other reasons, "[s]uch an individualized assessment of the reason for the inconsistency would be based either on pure speculation, or would require inquiries into the jury's deliberations that courts generally will not undertake" (*Powell*, 469 US at 66, quoted in *People v Rayam*, 94 NY2d 557, 563 [2000]). Hence, federal courts do not review verdicts under the theory of repugnancy.

New York, in contrast, has chosen a more moderate approach that extends better protection against verdicts that are inherently repugnant on the law. Our standard for judging

whether a verdict is legally repugnant was articulated in 1981 in *People v Tucker* (55 NY2d 1 [1981]). We held that "a verdict as to a particular count shall be set aside" as repugnant "only when it is inherently inconsistent when viewed in light of the elements of each crime as charged to the jury" (*id.* at 4) without regard to the accuracy of those instructions (*see id.* at 7; *see also People v Green*, 71 NY2d 1006, 1008 [1988]; *People v Hampton*, 61 NY2d 963, 964 [1984]). The underlying purpose of this rule is to ensure that an individual is not convicted of "a crime on which the jury has actually found that the defendant did not commit an essential element, whether it be one element or all" (*Tucker*, 55 NY2d at 6). A person cannot be convicted of a crime if a jury has necessarily decided that one of the essential elements was not proven beyond a reasonable doubt.[1]

We recognized in *Tucker* that a jury "may freely reject evidence and exercise its mercy function" by rendering a verdict that appears to be factually illogical (*id.* at 8). A jury is therefore free to extend leniency and may decide not to convict a defendant of one or more charges notwithstanding the court's legal instructions. In light of the difficulty in assessing the basis of jury determinations, we devised a repugnancy test in *Tucker* that prohibits consideration of the particular facts of the case (*Tucker*, 55 NY2d at 4, 6-7; *see e.g. People v Rayam*, 94 NY2d at 561; *People v Johnson*, 70 NY2d 819, 820 [1987] [a repugnancy claim must be "(e)xamined against the elements of the crimes as charged by the trial court and without regard to the particular facts of the case"]).[2] Thus, under the *Tucker* rule, "[t]he instructions to the jury will be examined only to determine whether the jury, as instructed, must have reached an inherently self-contradictory verdict" (*Tucker*, 55 NY2d at 8; *see also People v Trappier*, 87 NY2d 55, 58 [1995]).

*Tucker* is essentially a variant of the "theoretical impossibility" test that is applied in the realm of lesser included offenses (*see e.g. People v Davis*, 14 NY3d 20, 22-23 [2009]). Under this comparable approach, a verdict is repugnant only if it is legally

---

1. The remedy for this type of error is dismissal of the repugnant conviction (*see e.g. People v Hampton*, 61 NY2d at 964; *People v Carbonell*, 40 NY2d 948, 948-949 [1976]).

2. This precedent refutes the dissent's assertion that *Tucker* "does not mandate that we evaluate the elements of a crime charged in the abstract" (dissenting op at 553). Indeed, *Tucker* itself rejected a repugnancy approach that would allow a court to examine the entire record in favor of a test that considers only the elements as charged to the jury (*see People v Rayam*, 94 NY2d at 561). This erroneous premise infects the dissent's entire rationale.

impossible—under all conceivable circumstances—for the jury to have convicted the defendant on one count but not the other. If there is a possible theory under which a split verdict could be legally permissible, it cannot be repugnant, regardless of whether that theory has evidentiary support in a particular case (*see People v Vargus*, 79 AD3d 526, 527 [1st Dept 2010], *lv denied* 16 NY3d 800 [2011]). In this context, the apparently illogical nature of the verdict—as opposed to its impossibility—is viewed as a mistake, compromise or the exercise of mercy by the jury, none of which undermine a verdict as a matter of law (*see generally People v Horne*, 97 NY2d 404, 413 [2002]; *People v Rayam*, 94 NY2d at 561-563; *People v Goodfriend*, 64 NY2d 695, 697 [1984]; *People v Tucker*, 55 NY2d at 7).

We further explained in *Tucker* how the repugnancy analysis should operate (*see* 55 NY2d at 6 n 2). As an example, *Tucker* cited a case where charge 1 requires proof of elements A, B and C; charge 2 requires proof of elements A, B, C and D. If the jury convicts a defendant on the second charge, thereby finding that all four elements have been proven beyond a reasonable doubt, but acquits on the first charge, the verdict is repugnant since the acquittal "would necessarily involve a finding that at least one of the essential elements of charge 2"—either A, B or C—was not proven beyond a reasonable doubt (*id.*). As an extension of that hypothetical, if in another case the elements of charge 1 were A, B, C and E (rather than D), an acquittal on that count would not necessarily negate guilt on charge 2 because the jury could have found that element E—which was not an element of charge 2—was not proven by the People beyond a reasonable doubt, but elements A, B, C and D were. Under the latter scenario, there is no legal repugnancy.

The crimes at issue in *Tucker* also provide insight into the proper analytical framework to review repugnancy. Tucker was charged with four counts of robbery, one count of grand larceny and one count of criminal possession of a weapon. The jury acquitted him of counts one (robbery while armed with a deadly weapon) and two (use or threatened use of a dangerous weapon), but convicted him of counts three (displaying what appeared to be a handgun), four (being aided by another person actually present) and six (possession of a loaded firearm).[3] The trial court's charge on counts one and two explained that the People

---

**3.** Count five, charging grand larceny, was not considered by the jury because it was a lesser included offense of the first four counts.

had to prove that the firearm was operable, but that element was omitted from the instructions on the weapon possession charge in count six.[4]

We observed that the jury could have found—"however illogically" (55 NY2d at 8)—that the People did not prove operability. Under that theoretical proposition, we reasoned "there would have been no inherent inconsistency in the acquittals on counts 1 and 2, both of which require[d] a finding of operability, and the conviction on count 6," which did not (*id.* at 9). Nor was there any inherent inconsistency between the acquittals and the conviction on count three (displaying what appears to be a firearm) because the People were not required to prove operability under the third count and the jury could have found that Tucker failed to prove the affirmative defense that the gun was inoperable (*see id.*). Consequently, the verdict in *Tucker* was deemed not repugnant.

■ We reach a similar conclusion in the two appeals before us. In *Muhammad*, the jury charge explained that the elements of second-degree weapon possession were (1) possession (2) of a loaded firearm (3) with the intent to use it unlawfully against another; and that the elements of first-degree assault were (1) causing serious physical injury (2) by means of a deadly weapon (3) with the intent to inflict serious physical injury. In *Hill*, the jury was charged that third-degree weapon possession required (1) knowing possession (2) of a hammer (3) with intent to use it unlawfully against another; and that second-degree assault required (1) causing physical injury (2) by means of a dangerous instrument (3) with the intent to cause physical injury.[5]

Based on the instructions that were given to the juries and viewed from a theoretical perspective without regard to the evidence presented at these trials, it was possible for these juries to acquit defendants of weapon possession but convict them of assault because the former crime contains an essential element that the latter does not: possession. The weapon counts required that defendants physically possess their respective weapons or

---

4. Operability was therefore akin to the hypothetical "element E" in the preceding paragraph.

5. Both defendants raised a repugnancy claim before the jurors were discharged (*see e.g. People v Carter*, 7 NY3d 875, 876 [2006]). The preservation requirement is important because if a trial court finds that an announced verdict is repugnant, it may explain the inconsistency to the jurors and direct them to reconsider their decision (*see* CPL 310.50 [2]; *People v Loughlin*, 76 NY2d 804, 806 [1990]).

exercise dominion or control over them (*see* Penal Law § 10.00 [8]; § 265.02 [1]; § 265.03 [1] [b]). The assault counts, however, required that defendants injure the victims "by means of" the weapons (Penal Law § 120.05 [2]; § 120.10 [1]) and that result could have been accomplished without possessing those instruments.[6] There are many circumstances under which it would be rational for a jury to find that a defendant assaulted someone but did not concomitantly possess a weapon. For example, if an assailant throws someone in front of a moving bus or subway train, he can commit assault without "possessing" the bus or subway.[7] Other examples of assault without possession of an injury-causing instrumentality include a situation where the People fail to prove that a handgun was operable but show that the accused used it as a dangerous instrument to pistol whip the victim and cause physical injury, or if the accused impaled a person on a weapon without having physical control over it. Hence, in theory, it is possible for a jury to find—without being legally repugnant—that a defendant intentionally caused injury by means of a weapon without also possessing the item. That reasoning controls in these cases.

Because our repugnancy analysis requires that we review the elements of the offenses as charged to the jury without regard to the proof that was actually presented at trial, we cannot say that the convictions were repugnant. Since a hypothetical jury could have acquitted defendants of weapon possession based on the possession element, it cannot be assumed—as a matter of law—that the juries necessarily found that defendants lacked an intent to use the weapons unlawfully against another.[8] The acquittals on the weapon possession counts did not inherently negate the intent to cause serious physical injury element of first-degree assault or the intent to cause physical injury element of second-degree assault. Under the *Tucker* test, we

---

6. *See e.g. People v Galvin* (65 NY2d 761, 762 [1985]).

7. Contrary to the dissent's suggestion (*see* dissenting op at 552), our point is not that these situations would never result in a weapon possession charge, but that it is theoretically possible for a person to injure another "by means of" a weapon without necessarily possessing it.

8. *Cf. People v Loughlin* (76 NY2d at 806-807 [convictions of criminally negligent homicide and vehicular assault meant that the jury necessarily found that the defendant killed a victim with criminal negligence and drove while intoxicated for purposes of determining that an acquittal on vehicular manslaughter was repugnant to the vehicular assault conviction because the jury could not find that the defendant both did and did not drive under the influence]).

conclude that, based on the instructions that were issued to the juries, the verdicts in these cases need not be invalidated.

Although the Appellate Division reached the correct result, it did not apply the *Tucker* analysis but instead attempted to reconcile the verdicts based on the proof that was actually presented in these cases. Nevertheless, the Appellate Division's reasoning demonstrates why we cannot accept defendants' invitation to assume that these juries were irrational. The Appellate Division believed that the jury charges on weapon possession—which were essentially identical to the charge recommended by the pattern Criminal Jury Instructions (CJI)—allowed the jurors to consider whether defendants had an unlawful intent to use the weapons at the time they were initially acquired or possessed, before they were used unlawfully. And, the parties did not ask for and the trial courts did not charge the expanded intent instruction. If they had, the juries would have been told that it was permissible to convict defendants of weapon possession if the requisite mens rea was formed at any time that the weapons were in their control—including the instant the weapons were used against the victims (*see e.g.* CJI2d[NY] Culpable Mental States—Intent ["The intent can be formed, and need only exist, at the very moment the person engages in prohibited conduct or acts to cause the prohibited result, and not at any earlier time"]).

Because the jurors were not informed about this principle, it is entirely conceivable that they misunderstood the timing factor of the mens rea requirement and separated the charges into two different temporal periods—weapon possession before the attacks occurred (i.e., prior to the formation of an intent to injure); and assault once the attacks began—instead of realizing that both crimes could have occurred simultaneously and that the intent to use the weapons unlawfully could reasonably be inferred from their criminal use. This would not have been the first time a jury was confused about the continuing nature of a weapon possession offense (*see e.g. People v Haymes*, 34 NY2d 639, 640 [1974], *cert denied* 419 US 1003 [1974]). From a practical perspective, the Appellate Division's approach may very well explain the reasoning of the jurors in these cases. But from a legal standpoint, the question is not whether there was proof that these defendants possessed weapons innocently at some point and later developed an unlawful intent—it is whether a theoretical defendant charged with the same offenses (as framed by the actual jury instruction) could have been guilty of one but not the other.

In the absence of demonstrable legal repugnancy—i.e., a factual finding by the jury that the People necessarily failed to prove an element of a convicted offense—it is simply impossible for us to know why the jurors acquitted defendants of weapon possession (*see generally United States v Powell*, 469 US at 66). Such sheer conjecture about what actually occurred in the minds of the jurors during deliberations is the reason why our precedent precludes judges from "intrud[ing] into the jury's deliberative process" (*Tucker*, 55 NY2d at 7) and requires repugnancy to be analyzed from a theoretical perspective. Jurors are allowed to compromise, make mistakes, be confused or even extend mercy when rendering their verdicts—a principle not acknowledged by the dissent.

Indeed, verdicts of this nature are not uncommon.[9] This suggests that jurors may need additional guidance in some weapon possession prosecutions. In Hill's case, for example, the jury may have thought that he possessed his weapon—a common household hammer—for an extended period of time with the intent to use it as a tool rather than as an instrument of harm, and acquitted him on that basis. Even assuming this to be true, however, an initial period of innocent possession, no matter how long in duration, is not determinative of a person's guilt for weapon possession because a criminal intent can arise moments before the item is used for a criminal purpose—but Hill's jury may have been unaware of this fact.

Although as a Court we are divided on whether the convictions here were valid, we are unanimous in recommending that it would be a better practice for counsel to request and trial judges to add additional language to the jury instructions for weapon possession in multicount indictments. For example, the suggested CJI charge for fourth-degree weapon possession states that "INTENT means conscious objective or purpose . . . a person acts with intent to use a (*specify*) unlawfully against another when his or her conscious objective or purpose is to use it unlawfully against another" (CJI2d[NY] Penal Law § 265.01

---

**9.** *See e.g. People v Francois* (85 AD3d 813, 814 [2d Dept 2011]); *People v Gross* (71 AD3d 1526, 1526-1527 [4th Dept 2010], *lv denied* 15 NY3d 774 [2010]); *People v Malave* (52 AD3d 1313, 1314 [4th Dept 2008], *lv denied* 11 NY3d 790 [2008]); *People v Bennette* (23 AD3d 489 [2d Dept 2005]); *People v Sackes* (11 AD3d 364, 365 [1st Dept 2004], *lv denied* 4 NY3d 748 [2004]); *People v Afrika* (291 AD2d 880, 881 [4th Dept 2002], *lv denied* 98 NY2d 648 [2002]); *People v Mabry* (288 AD2d 326 [2d Dept 2001], *lv denied* 97 NY2d 706 [2002]); *People v Fuller* (200 AD2d 498 [1st Dept 1994], *lv denied* 83 NY2d 871 [1994]).

[2]). The potential for the jury to misunderstand the nature of the mens rea requirement could be minimized by explaining that the intent element is satisfied if the defendant intended to use the weapon unlawfully against another at any time during the period of possession, including when the weapon was allegedly used for the alleged unlawful act. This language, or some other version of the relevant portion of the expanded intent charge in the CJI, would provide more useful instruction to jurors on the governing principles of law.

We stress that the issue before us is whether the verdicts were *legally* repugnant, not whether they were *factually* repugnant. If the juries in these cases had been specifically informed that defendants' intent at the moment of the attacks was relevant to the weapon possession counts, we might agree that a split verdict would be factually irreconcilable. Where that is true, the trial judge may not be required to accept the verdicts, even if they are not legally repugnant. The parties have not identified anything in the Criminal Procedure Law or our precedent that restricts a trial judge's discretion to address the jury when a verdict appears to be inconsistent with the evidence presented. If such a concern arises, the judge can point out the apparent inconsistency to the jurors, issue further appropriate instructions and ask them to continue deliberations. But a failure to take such action would not be an abuse of discretion as a matter of law since factual repugnancy—which can be attributed to mistake, confusion, compromise or mercy—does not provide a reviewing court with the power to overturn a verdict under *Tucker* and its progeny.

### III

Defendant Muhammad also contends that the trial court abused its discretion as a matter of law when it denied his motion to present expert testimony on eyewitness identifications because the victim was the only witness who implicated defendant and the identification was not corroborated. The People assert that it was not an abuse of discretion to deny the motion because the primary theory of the defense was not that the reliability of the identification was suspect, but that the victim lied about the identity of the shooter, and as such an expert was unnecessary since the victim had known defendant for many years and had spoken to him shortly before the incident occurred.

As a general rule, it is an abuse of discretion to deny a motion for expert testimony on eyewitness identifications in a case that

depends solely on the accuracy of eyewitness testimony if there is no corroborating evidence connecting the defendant to the commission of the charged crime and the proposed testimony satisfies the general criteria for the admissibility of expert proof (*see People v Abney*, 13 NY3d 251, 267 [2009]; *People v LeGrand*, 8 NY3d 449, 452 [2007]). Our concern in recent years has arisen from psychological studies that have addressed the potential for misidentification when a person observes an assailant—usually a stranger—for the first time in a highly stressful environment (*see People v Santiago*, 17 NY3d 661 [2011] [decided today]).

Although *Muhammad* is a single eyewitness case (*see People v Abney*, 13 NY3d at 268) with no corroborating evidence (*cf. People v Allen*, 13 NY3d at 269; *People v Young*, 7 NY3d 40, 46 [2006]; *People v Lee*, 96 NY2d 157, 163 [2001]), and the shooter did not have any "unusual or distinctive features or physical characteristics" (*People v Abney*, 13 NY3d at 268), the victim testified that he knew defendant for over a decade prior to the shooting, spoke to him shortly before the altercation and recognized defendant at the time of the attack (*compare People v Allen*, 13 NY3d at 262-263 [witnesses had known the defendant from the neighborhood for several months and immediately recognized him during the robbery], *with People v Santiago*, 17 NY3d at 664 [the defendant and victim were strangers] *and People v LeGrand*, 8 NY3d at 452-453 [the defendant was not previously known to the witnesses and was not identified until seven years after the crime]). This prior relationship took any issue regarding human memory formation and recollection out of the case, rendering the victim's ability to perceive his attacker as the only aspect on which expert testimony was even potentially relevant. As the trial judge aptly recognized, an average juror would have been capable of assessing whether a person in the victim's situation had an adequate opportunity to observe someone he had known for so long. Moreover, the defense never directly challenged the victim's ability to observe or recall who shot him, but instead sought to characterize his testimony implicating defendant as a lie, thereby further removing the scope of the proposed expert testimony from the issues presented to the jury.

On these facts, we hold that it was not an abuse of discretion as a matter of law for the trial court to deny defendant's request for expert testimony.

## IV

As a final matter, defendant Hill maintains that Supreme Court erroneously denied his motion to suppress evidence that was obtained during a warrantless search of his home and in a vestibule outside of his abode. The court found that defendant consented to the police officers' entry into his apartment, that statements he made to them were voluntary and that he had no reasonable expectation of privacy in the vestibule. The Appellate Division affirmed, concluding that exigent circumstances justified the search.

■ The Appellate Division's rationale for affirming the denial of the motion to suppress was improper. We recently reiterated that, under CPL 470.15 (1), an appellate court cannot affirm an order "on a ground not decided *adversely* to the appellant by the trial court" (*People v Concepcion*, 17 NY3d 192, 195 [2011]). Because the suppression court did not deny the motion on the ground that there were exigent circumstances, that issue was not decided adversely to defendant and it could not be invoked by the Appellate Division. As a result, this matter is remitted to that court for consideration of the suppression issues that were properly raised but not determined by it.

Accordingly, in *People v Muhammad*, the order of the Appellate Division should be affirmed. In *People v Hill*, the order of the Appellate Division should be modified by remitting to that court for further proceedings in accordance with this opinion and, as so modified, affirmed.

CIPARICK, J. (dissenting). When an acquittal of one crime, as charged, negates the existence of an essential element of another crime, as charged, for which a defendant has been convicted, the conviction must be set aside. This is the lesson from *People v Tucker* (55 NY2d 1 [1981]), wherein we enunciated a standard for determining whether a jury verdict is legally repugnant. Because I believe the jury verdicts in these cases were clearly repugnant under that standard, I respectfully dissent and would vote to reverse the convictions in both cases.

In *Tucker*, we recognized that, in reviewing the validity of a jury verdict, "[t]he critical concern is that an individual not be convicted for a crime on which the jury has actually found that the defendant did not commit an essential element, whether it be one element or all" (55 NY2d at 6). We went on to say that "[a]llowing such a verdict to stand is not merely inconsistent with justice, but is repugnant to it" (*id.*). In determining

whether a jury verdict is repugnant, a court must look "to the record only to review the jury charge so as to ascertain what essential elements were described by the trial court" (*id.* at 7). We stated that, "[u]nder this approach, a conviction will be reversed only in those instances where acquittal on one crime as charged to the jury is conclusive as to a necessary element of the other crime, as charged, for which the guilty verdict was rendered" (*id.*).

We concluded in *Tucker* that the jury verdict in that case was not repugnant. There, in a multiple count indictment, a grand jury had charged the defendant with four counts of robbery, one count of grand larceny and one count of criminal possession of a weapon. Following its deliberations, the jury acquitted the defendant of count one, first-degree robbery under the theory that the defendant forcibly stole property while armed with a deadly weapon (*see* Penal Law § 160.15 [2]) and count two, first-degree robbery under the theory that the defendant forcibly stole property while using or threatening the immediate use of a dangerous instrument (*see* Penal Law § 160.15 [3]). The jury, however, convicted the defendant of count three, first-degree robbery under the theory that the defendant forcibly stole property and displayed what appeared to be a firearm (*see* Penal Law § 160.15 [4]) and count four, second-degree robbery under the theory that the defendant forcibly stole property while being aided by another person actually present (*see* Penal Law § 160.10 [1]). It also convicted the defendant of count six, third-degree criminal possession of a weapon under the theory that the defendant possessed a loaded firearm (*see* former Penal Law § 265.02 [4]).[1]

On appeal in *Tucker*, the defendant contended, in part, that the jury's decision to convict him of the weapon possession count under count six, but acquit him of armed robbery under count one could only mean that the jury concluded "no forcible stealing occurred" (*id.* at 5 [internal quotation marks omitted]). According to the defendant, since the jury determined that the evidence did not support a finding that he forcibly stole property under count one, the jury's decision to convict him of the robbery charges under counts three and four, which likewise required proof of this essential element, rendered the verdict repugnant (*see id.*).

---

**1.** As the majority notes (*see* majority op at 540 n 3), the jury in *Tucker* did not consider the grand larceny count (the property, regardless of its value, is taken from the person of another) since it was a lesser included offense of the robbery charges.

In rejecting the defendant's interpretation of the verdict, we examined the specific elements of the court's charge. We noted that, although the court instructed that the People had to prove that the firearm was operable to sustain a robbery conviction under counts one and two, the court omitted that element from its instructions on the weapon possession charge under count six (*see id.* at 8-9). Accordingly, the jury's finding that the defendant possessed a loaded firearm did not necessarily translate into a finding that such firearm was operable (*see id.* at 9 n 6). Thus, contrary to the defendant's assertions on appeal, the jury's decision to acquit him of the robbery charges under counts one and two did not mean that the jury had to necessarily find that the evidence did not support the element of forcible stealing. Rather, "[i]n considering counts 1 and 2, the jury could [have] conclude[d] that the prosecutor failed to prove beyond a reasonable doubt that the gun was capable of firing, and therefore acquit[ted]" on that basis (*id.* at 9). We further observed that such a finding was not inconsistent with a finding of guilt with respect to count three (displaying what appeared to be a firearm) because operability of the firearm was not a required element of this offense (*see id.*). In sum, having analyzed the essential elements of each offense, as charged by the trial court, we concluded that there were no inherent inconsistencies in the verdict that would render it repugnant.

Contrary to the majority's conclusion, the same cannot be said about the verdicts at issue here. In *People v Muhammad*, defendant was indicted, as relevant here, for assault in the first degree (Penal Law § 120.10 [1]) and criminal possession of a weapon in the second degree (Penal Law § 265.03 [1] [b]) for allegedly shooting a man five times with a loaded firearm. In its instructions to the jury, the trial court explained that defendant Muhammad had been charged with first-degree assault under the theory that "with the intent to cause serious physical injury to another person, caused such injury to [the victim] *by shooting him with a deadly weapon*, to wit: A handgun" (emphasis added). The court instructed that, in order for the jury to find Muhammad guilty of this crime, it had to find that he (1) "caused serious physical injury to [the victim] *by means of* a deadly weapon" and (2) "that he did so with an intention to cause such serious physical injury to [the victim]" (emphasis added). The trial court, in addressing the jury on the second-degree weapon possession count, indicated that Muhammad had been charged under the theory that he "possessed a loaded

firearm, to wit: A handgun, with the intention to use it unlaw-
fully against [the victim]." The trial court told the jury that, to
find Muhammad guilty of this count, it had to find that he
"[one] possessed a loaded firearm. Two. That he did so know-
ingly. Three. That the gun was operable. Four. That he pos-
sessed this firearm with the intent to use it unlawfully against
[the victim]."

Employing our analysis in *Tucker*, I conclude that the jury's
verdict convicting Muhammad of assault but acquitting him of
weapon possession was repugnant. In convicting Muhammad of
the assault count, the jury, based on the court's instructions,
had to find that, in causing serious physical injury to the victim
by means of a deadly weapon, he necessarily possessed a loaded
and operable firearm. After all, as the trial court explained in
its charge, Muhammad was indicted under a theory that he shot
the victim. Thus, it should go without saying that Muhammad
could not have shot the victim with a firearm if he did not pos-
sess one. The jury, in rendering its guilty verdict on the assault
count, also had to find that Muhammad intended to cause seri-
ous physical injury to the victim by means of such firearm. Yet,
in acquitting Muhammad of the weapon possession count, the
jury had to find that the People either failed to prove that he
possessed a loaded firearm, that it was operable or that he
intended to use it unlawfully. Any one of these findings requires
a reversal of the assault count under our standard in *Tucker*.
For example, if the jury found that Muhammad either did not
possess the loaded firearm or that the firearm was inoperable,
it, at the same time, could not have concluded that Muhammad
shot the victim and caused the victim serious physical injury.
Alternatively, if the jury concluded that Muhammad did not
intend to use the firearm unlawfully, it could not simultaneously
have found that he intended to cause the victim serious physical
injury, an unlawful act, by means of the loaded firearm.

My analysis in *People v Hill* is no different. Here, the defend-
ant was indicted for assault in the second degree (Penal Law
§ 120.05 [2]) and criminal possession of a weapon in the third
degree (Penal Law § 265.02 [1]) for allegedly striking a man in
the head with a hammer. In the court's instruction to the jury,
it indicated that, in order to find Hill guilty of second-degree as-
sault, the jury had to find that he "[one] caused physical injury
to [the victim] *by means of* a dangerous instrument; and two,
that [Hill] did so with the intent to cause physical injury to [the
victim]" (emphasis added). In defining the elements of second-

degree assault, the court explained that a "dangerous instrument" is "any instrument . . . which, *under the circumstances in which it is used* . . . is readily capable of causing death or other serious physical injury" (emphasis added). Turning to the third-degree weapon possession count, the court explained to the jury that, in order for Hill to be guilty of this offense, it had to find that "[one, Hill] possessed a hammer; two, that [he] did so knowingly; and, three, that [he] did so with intent to use such hammer unlawfully against another."

Again, applying *Tucker*, I conclude that the jury's verdict convicting Hill of assault, but acquitting him of the weapon possession under the circumstances of this case is repugnant. In convicting Hill of the assault count, the jury, based on the court's instructions, had to find that, in causing physical injury to the victim by means of a dangerous instrument, he necessarily possessed the hammer. Significantly, in directing the jury to consider whether the hammer at issue was a "dangerous instrument," the court instructed the jury to examine the circumstances in which such hammer was used. Since Hill was indicted under a theory that he struck the victim in the head with a hammer, the jury had to conclude that he possessed a hammer in order to find him guilty of assault, as charged. The jury, likewise, in rendering a guilty verdict on the assault count, had to find that Hill intended to cause the victim physical injury by means of such hammer. Yet, as in *Muhammad*, in acquitting Hill of the weapon possession count, the jury had to find that the People either failed to prove that he possessed the hammer or he did not intend to use it unlawfully against another. Either one of these findings requires a reversal of the assault count under our standard in *Tucker*. If the jury, for example, found that Hill did not possess the hammer, it could not have concluded that Hill struck the victim and caused him physical injury. Alternatively, if the jury concluded that Hill did not intend to use the hammer unlawfully against another, it could not simultaneously have found that he intended to cause the victim physical injury, an unlawful act, by means of the hammer.

Today, the majority pronounces that our repugnancy standard under *Tucker* "prohibits consideration of the particular facts of [a] case" (majority op at 539). According to the majority, *Tucker* stands for the proposition that if a conceivable circumstance exists—without regard to the facts—where a person could be convicted of one crime and acquitted of another, the verdict at

issue cannot be repugnant (*see id.* at 539-540). Applying their rule, the majority attempts to identify hypothetical situations where a defendant could theoretically be found guilty of assault by means of a dangerous instrument and concomitantly be found not guilty of a weapon possession charge. Their examples are inapposite.

In one category of hypotheticals, the majority considers cases where an assailant is found guilty of assault by means of a dangerous instrument for acts such as pushing a victim in front of a moving bus or subway or by impaling a victim on a weapon (*see id.* at 542). In those cases, the majority correctly points out the dangerous instruments at issue—the bus, subway or weapon—were not in the assailant's possession. Under the facts of those examples, however, a defendant would not have been indicted on a weapon possession charge since it would clearly be unwarranted as there was no evidence the assailant physically possessed or exercised dominion or control over the instrument at issue (*see* Penal Law § 10.00 [8]; *see also People v Galvin*, 65 NY2d 761, 762 [1985]). Since the assailant could not properly be charged with weapon possession in the examples cited above, no jury would have the occasion to consider whether, much less find that, such possession occurred in the first instance.[2]

The other hypothetical cited by the majority posits that it is conceivable to convict of assault by means of a dangerous instrument but acquit of weapon possession when, "the People fail to prove that a handgun was operable but show that the accused used it as a dangerous instrument to pistol whip the victim and cause physical injury" (majority op at 542). I do not disagree. In this example, by convicting the accused of assault, the jury would necessarily have to find that he possessed the handgun. After all, under the majority's facts, the accused was charged under a theory that he pistol whipped the victim. The jury, however, would not be required to return a guilty verdict on the weapon possession count because it could find that, although the accused possessed the handgun, the People failed to prove an element not essential for a finding of guilt under the assault count: that the gun was operable (*see Tucker*, 55 NY2d at 7).

---

2. While I agree with the majority that it is "theoretically possible for a person to injure another 'by means of' a weapon without necessarily possessing it" (majority op at 542 n 7), it was not possible in these cases. The inquiry under *Tucker* is whether the juries, as charged, could have found that defendants committed assault "by means of" a weapon without possessing one, not whether it is theoretically possible, in the abstract, to do so.

This example, however, is clearly distinguishable from the cases before us. Unlike this hypothetical, the juries' acquittals of the weapon possession counts in *Muhammad* and *Hill*, necessarily negated the existence of one or more of the essential elements required to sustain a conviction for assault, as charged.

In a sense, the majority, by invoking a different set of facts to illustrate an example where a jury could render a verdict, convicting a defendant of assault but acquitting him of weapon possession, that is not repugnant, invites us to consider what they claim *Tucker* proscribes: consideration of the particular facts of a case. This is an unworkable rule and inconsistent with our holding in *Tucker*. While *Tucker* instructs a court not "to intrude into the jury's deliberative process by speculating on how the jury perceived and weighed the evidence" (55 NY2d at 7) it does not mandate that we evaluate the elements of a crime charged in the abstract. Rather, a review of the jury charge to ascertain what essential elements were described by the trial court will invariably include a review of the trial court's description of the factual theory of the case.[3] To hold otherwise would permit courts to conjure inapplicable scenarios that depart from an analysis of the charge at issue in a particular case and sanction verdicts that, under *Tucker*, are undoubtedly repugnant. The majority's analysis today takes us far afield from the standard announced in *Tucker* that assures "an individual not be convicted for a crime on which the jury has *actually* found that the defendant did not commit an essential element" (55 NY2d at 6 [emphasis added]).

The Appellate Division's basis for affirming these convictions is likewise unpersuasive. In both *Muhammad* and *Hill*, the Appellate Division applied a temporal test on the issue of intent and concluded that the jury charges on weapon possession did not preclude the juries from finding that defendants, at some point in time prior to the assault, possessed their respective weapons without the intent to use them unlawfully. In my view, that is an unfair reading of the charges submitted to the juries. The trial court's instructions on weapon possession, in both cases, asked the juries simply to consider whether defendants formed the intent to use the weapons at issue unlawfully. The

---

**3.** Contrary to the majority's assertion, a court's review of the elements, as charged, in the context of the factual theory of a case, also as charged, "would [not] allow a court to examine the entire record" to determine whether a jury has returned a repugnant verdict (majority op at 539 n 2). Regrettably, the majority misreads my analysis in the same way it misreads *Tucker*.

charges did not direct the jurors to consider the intent of defendants prior to the incidences for which they were indicted. Thus, in convicting defendants of assault, as charged, the juries had to find that defendants possessed the weapons at issue with intent to commit the unlawful act of causing physical injury at the date and time of the occurrence. Therefore, the juries' decisions to acquit on the weapon possession counts necessarily negated an essential element of assault, rendering these verdicts repugnant.

The majority notes that "verdicts of this nature are not uncommon" (majority op at 544) and cites numerous cases where such verdicts have been upheld (see majority op at 544 n 9). The genesis of this rationale is probably rooted in a memorandum opinion of this Court, which predated our decision in *Tucker*, where we stated "[t]he record clearly shows that the jury did not understand the continuing nature of the possession element and grounded its acquittal on its finding that at the time defendant acquired the gun he did not intend to use it unlawfully" (*People v Haymes*, 34 NY2d 639, 640 [1974]). Rather than sanctioning this practice, we should instruct our trial courts, going forward, not to accept verdicts of this nature in these types of cases. It should be noted that in both of these cases, following the rendering of the verdicts, trial counsel requested that the courts reinstruct the juries. The courts, in both instances, denied the requests.

To the extent that there is juror confusion on the issue of intent, our trial courts, as the majority observes (see majority op at 544-545) should supplement their instructions on the issue of intent and explain that "intent can be formed, and need only exist, at the very moment the person engages in prohibited conduct or acts to cause the prohibited result, and not at any earlier time" (CJI2d[NY] Culpable Mental States—Intent). In sum, the fact that verdicts of this nature routinely occur should not serve as the basis for creating an overly abstract rule, adopted by the majority today, that departs from our precedent in *Tucker* solely in an effort to preserve these convictions.

Accordingly, I would vote to reverse the orders of the Appellate Division and dismiss the indictments in both cases.

Judges READ, SMITH and PIGOTT concur with Judge GRAFFEO; Judge CIPARICK dissents and votes to reverse in a separate opinion in which Chief Judge LIPPMAN and Judge JONES concur.

In *People v Muhammad*: Order affirmed.
In *People v Hill*: Order modified, etc.