■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v TIMOTHY S. REICHEL, Appellant. [975 NYS2d 470]—

Egan Jr., J. Appeal from a judgment of the Supreme Court (Lamont, J.), rendered December 16, 2011 in Albany County, upon a verdict convicting defendant of the crime of manslaughter in the second degree.

At some point after 8:00 p.m. on October 29, 2010, defendant, who had been drinking since approximately 11:30 a.m. that day, and his pregnant girlfriend (hereinafter the victim) left their residence in the victim's 2005 Mitsubishi Gallant to go to the store. As the vehicle proceeded northbound on Lishakill Road in the Town of Colonie, Albany County, it crossed over the fog line on the east shoulder, prompting the driver to overcorrect. The vehicle then crossed the center line of the road and struck a speed limit sign on the opposite shoulder, at which point the right rear tire went flat, causing the vehicle to roll onto its roof. The vehicle continued to travel—inverted—in a generally northerly direction across the lawn of a residence until it struck—and sheared off—a sizeable tree. Upon impact with this tree, which occurred just behind the left front tire of the vehicle, the engine compartment of the Mitsubishi separated from the rest of the car. The passenger compartment—with most of the weight now concentrated in the rear of the vehicle—continued north, spinning counterclockwise and righting itself before finally coming to rest upon its impact with a second tree. During the course of these events, both defendant and the victim—neither of whom were wearing seat belts—were ejected from the vehicle through either the driver's-side window or the driver's side of the windshield,[1] as a result of which defendant sustained serious injuries and the victim died. Based upon yaw marks observed on the pavement at the scene, the actual speed of the Mitsubishi prior to impact was calculated to be 76.92

---

1. The People's and defendant's respective experts agreed that both defendant and the victim were ejected through the driver's side of the car but differed as to when those ejections occurred.

miles per hour.[2] A subsequent examination of the vehicle revealed that the driver did not apply the brakes prior to the crash, and road conditions, weather conditions and mechanical issues were ruled out as contributing factors to the accident.

The initial police investigation concluded that defendant was driving on the night in question and, as a result, defendant was indicted and charged in a 10-count indictment with, insofar as is relevant here, aggravated vehicular homicide, manslaughter in the second degree, driving while intoxicated per se and driving while intoxicated.[3] Following a lengthy jury trial, defendant was convicted of manslaughter in the second degree and acquitted of the remaining counts. Defendant thereafter was sentenced as a second felony offender to a prison term of 7½ to 15 years. Defendant's subsequent motion to set aside the verdict was denied, prompting this appeal.[4]

We affirm. Initially, we reject defendant's assertion that Supreme Court erred in failing to discharge a sworn juror. "If at any time after the trial jury has been sworn and before the rendition of its verdict, . . . the court finds, from facts unknown at the time of the selection of the jury, that a juror is grossly unqualified to serve in the case or has engaged in misconduct of a substantial nature, . . . the court must discharge such juror" (CPL 270.35 [1]; *see People v Buford*, 69 NY2d 290, 298 [1987]; *People v Lapage*, 57 AD3d 1233, 1235 [2008]). A juror will be deemed to be grossly unqualified to serve only when, after "conduct[ing] a probing, tactful inquiry into the specific circumstances" (*People v Cecunjanin*, 67 AD3d 1072, 1076 [2009], *mod on other grounds* 16 NY3d 488 [2011] [internal quotation marks and citation omitted]),[5] "it becomes obvious that a particular juror possesses a state of mind which would prevent the rendering of an impartial verdict" (*People v Buford*, 69 NY2d at 298 [internal quotation marks and citation omitted]; *see People v Brock*, 107 AD3d 1025, 1028 [2013], *lv denied* 21 NY3d 1072 [2013]; *People v Wright*, 13 AD3d 736, 739 [2004], *lv denied* 4 NY3d 837 [2005]). We conclude—based upon our review of the record—that no such showing was made here.

---

**2.** The People's expert defined a yaw mark as "a mark left by a tire that's both rolling and sliding," which occurs "when the speed of a vehicle exceeds the tires['] ability to maintain grip with the road surface."

**3.** Only these four counts were submitted to the jury.

**4.** Defendant's motion for a stay and bail pending appeal was denied by a Justice of this Court.

**5.** To the extent that defendant now suggests that Supreme Court's inquiry in this regard was insufficient, this argument is unpreserved for our review (*see People v Grimm*, 107 AD3d 1040, 1041 [2013], *lv denied* 21 NY3d 1042 [2013]) and, in any event, is belied by the record.

Trial counsel initially asserted that juror No. 2 was glaring at her, prompting a concern that this juror already had formed an opinion as to defendant's guilt. Supreme Court questioned the first six sworn jurors, in response to which juror No. 2 indicated that he could follow the court's instructions regarding, among other things, the presumption of innocence and keeping an open mind. Following this inquiry, defense counsel voiced no objection to juror No. 2's continued service and, in any event, "a sworn juror should not be discharged merely because [he or] she is irritated with one of the attorneys" (*People v Buford*, 69 NY2d at 298-299).

The following day, Supreme Court received a note from juror No. 2 indicating that he "may have seen someone [he] went to school with in the spectator area that may be a relative (possibly the father) of the victim." In response to Supreme Court's inquiry, juror No. 2 indicated that he had not seen the individual in question since he graduated from high school more than 30 years ago and reiterated that he could "still be fair." Although defense counsel asked that juror No. 2 be excused, "the juror's fleeting contact with [this individual] years earlier did not constitute such a close relationship of a business or personal nature as to render the juror grossly unqualified to continue serving in the case" (*People v Henderson*, 74 AD3d 1567, 1571 [2010], *mod* 77 AD3d 1168 [2010] [internal quotation marks and citation omitted]; *see People v Wright*, 13 AD3d at 739; *People v Cook*, 275 AD2d 1020, 1021 [2000], *lv denied* 95 NY2d 933 [2000]).

Finally, although juror No. 2 acted unwisely in beginning to read one of two articles appearing in a local newspaper,[6] he nonetheless assured Supreme Court that he had not formed any opinions about the case and that he could remain impartial. Under these circumstances, we do not find that juror No. 2 was grossly unqualified to serve or otherwise engaged in substantial misconduct (*see People v Jimenez*, 101 AD3d 513, 514 [2012], *lv denied* 20 NY3d 1100 [2013]; *People v Mason*, 299 AD2d 724, 724-725 [2002], *lv denied* 100 NY2d 564 [2003]).

Nor are we persuaded that Supreme Court abused its discretion in refusing to allow defendant to introduce evidence of the victim's prior traffic infractions and accidents, which, defendant

---

6. The first article, which juror No. 2 admittedly started to read, was captioned, "Jurors need to avoid case on the Internet" and generally discussed judicial admonitions to refrain from reading newspapers or the Internet while serving on a jury. A related article published the same day, which juror No. 2 denied reading, was captioned, "Who was driving in fatal crash?" and directly addressed defendant's trial.

contends, would have provided the jury with an alternative explanation for the accident, to wit, that it was the victim, not defendant, who was driving the Mitsubishi at the time of the accident. The flaw in defendant's argument on this point is that the victim's allegedly poor driving history simply is not probative of whether she was a passenger in or the driver of the Mitsubishi on the night in question (*see People v Carkner*, 213 AD2d 735, 739 [1995], *lv denied* 85 NY2d 970 [1995]; *cf. People v Scott*, 93 AD3d 1193, 1195 [2012], *lv denied* 19 NY3d 967 [2012]; *People v Clarkson*, 78 AD3d 1573, 1573-1574 [2010], *lv denied* 16 NY3d 829 [2011]), no more so than defendant's driving history—which included two prior convictions for driving while intoxicated and six prior convictions for aggravated unlicensed operation of a motor vehicle—would be probative of whether he was a passenger in or the operator of the vehicle.

Defendant next asserts that the verdict is not supported by legally sufficient evidence and, further, is against the weight of the evidence—specifically, that there is insufficient evidence to place him behind the wheel of the car at the time of the accident[7] and/or demonstrate that he recklessly caused the victim's death (*see* Penal Law § 125.15 [1]). Neither of these arguments has merit.

The record reflects that on the morning of the accident (Friday, Oct. 29, 2010), defendant showed up for work driving the victim's car—as he had done every other day that week. Defendant and his coworker, Harley Cioccke, both of whom worked for a local roofing company, clocked out early that day due to rain and drove—in the victim's car—to the Bayou Café in Schenectady County to have "a few beers." As defendant and Cioccke arrived before the establishment opened, they entered through the kitchen and, over the course of the next 90 minutes, each consumed several bottles of beer. The duo then left the bar and proceeded to Cioccke's house before returning to the employer's office to pick up their paychecks. After cashing their respective checks and purchasing a 12-pack of beer at a local market, defendant and Cioccke made their way to the residence that defendant shared with the victim, who was there caring for her infant daughter. Throughout this time, defendant continued to drive the victim's car.

After consuming an additional quantity of beer, defendant

---

**7.** In this regard, defendant relies upon the fact that (1) the keys to the vehicle were found beneath the victim's body, (2) only defendant's DNA was recovered from the passenger-side air bag, and (3) despite defendant's leg fracture, no trace of blood was found on the driver's-side carpeting or floor mat.

and Cioccke climbed back into the victim's Mitsubishi and, with defendant again driving, proceeded to a liquor store, where defendant purchased a bottle of vodka. Upon returning to defendant's residence, Cioccke began to drink the remaining bottles of beer, and defendant started drinking vodka with cranberry juice. Cioccke testified that, as the evening progressed, defendant indicated that "[h]e wanted to go get more alcohol." Cioccke refused to get in the car with defendant, who by then was "staggering" and "slurring his words," because "[defendant] was drunk, drunk, drunk, drunk." When defendant, who had the keys to the Mitsubishi, persisted, the victim, who wanted to go to the store to purchase some juice, indicated that "she wanted to drive." Defendant, however, insisted that "he was driving." Cioccke testified that, as defendant and the victim left the residence, he again heard the victim ask defendant "for the keys" and to "let [her] drive" and that defendant again replied, "[N]o." Cioccke did not, however, see either defendant or the victim enter the vehicle, nor did he see who was driving when the vehicle left the premises.

Similar testimony was adduced from Melissa Rowe, who was a friend of the victim. Rowe testified that she arrived at defendant and the victim's residence at approximately 6:30 p.m., at which time defendant and Cioccke were "[i]n the kitchen making drinks"—specifically, vodka with orange juice and cranberry juice. According to Rowe, defendant "couldn't even stand" and "was falling" at this point. During the time that she was at the residence, Rowe had one drink and saw defendant have "[f]ive or six" drinks. As the evening progressed, Rowe and the victim decided to go to the store to purchase some juice for the victim, who—as noted previously—was pregnant.[8] When the victim indicated that defendant would be accompanying them, Rowe backed out and offered to remain at the house with the victim's daughter. Shortly before defendant and the victim left the residence, Rowe saw defendant, whom she described as "stumbling" and "drunk," holding and "[t]wirling" the keys to the Mitsubishi in his hand.[9] At approximately 9:00 p.m., a 911 call was placed reporting the crash. More than one first responder detected the odor of alcohol on defendant's breath, and defendant's blood alcohol content approximately two hours after the accident was 0.15%.

---

**8.** Neither Cioccke nor Rowe saw the victim drink any alcoholic beverages that night, and the pathologist who performed the victim's autopsy testified that her toxicology screen was negative for alcohol or drugs.

**9.** At this point, according to Rowe, "less than half" of the bottle of vodka remained.

As the crash was unwitnessed, and because both defendant and the victim were ejected from the vehicle, the identity of the driver hinged—in large measure—upon the physical evidence recovered at the scene and the injuries sustained by defendant and the victim, as well as the testimony adduced from the respective experts.[10] In this regard, the record reflects that, upon being ejected from the vehicle, defendant came to rest in the front lawn of the residence at 130 Lishakill Road—lying just beyond, and having followed the same general trajectory as, the vehicle's windshield, engine compartment, steering wheel and bumper—while the victim was found lying in the middle of Lishakill Road (generally southeast of defendant's location). As noted previously, the keys to the vehicle, which broke off in the ignition switch, were found in the roadway underneath the victim. Photographic evidence and testimony also established that the passenger compartment on the driver's side of the vehicle sustained "heavy crush damage or intrusion"—as a result of which the floorboard on the driver's side was "almost completely crushed into the center console" of the vehicle. In contrast, although there was "some intrusion" into the front passenger-side compartment, "[t]here was minimal damage . . . , [and] the actual occupant area [remained] intact." Significantly, the testimony offered by the first responders and the pathologist demonstrated that although defendant sustained "an obvious fracture" to his lower right leg—an injury entirely consistent with the significant passenger space intrusion present on the driver's side of the vehicle—the victim suffered only superficial abrasions to one of her knees. Finally, the record reveals that, when paramedics arrived at the scene, the victim was found wearing a small pair of white sneakers, while defendant was found without shoes. When the Mitsubishi was examined following the crash, a large pair of grey slippers was recovered from the driver's side of the vehicle—wedged in the remnants of the driver's-side floorboard in such a fashion that the slippers had to be pried from the car. Subsequent analysis of a blood stain found on one of the slippers concluded that defendant was "the major contributor" to the DNA found thereon.

Based upon the trajectory of both the steering wheel and defendant's body, as well as the physical injuries that defendant sustained and the evidence recovered from inside the car, the People's expert, Jason DePaulo, concluded that defendant was

---

10. Such proof, of course, was in addition to Rowe's testimony that defendant was the last person seen holding the keys to the Mitsubishi, as well as Cioccke's testimony that defendant, who had been driving the victim's car all week, insisted upon driving that night.

driving at the time of the crash. Specifically, DePaulo opined that defendant was ejected when the Mitsubishi struck and sheared off the first tree—at which point the vehicle lost most of its speed; the victim, in turn, was ejected through the driver's-side window at some point after the vehicle began its counterclockwise rotation but before coming to rest upon its impact with the second tree, at which point the nose of the vehicle was pointing south and the driver's side of the vehicle was closest to Lishakill Road.[11] DePaulo's conclusions in this regard are based, in part, upon the fact that defendant traveled an overall greater distance than the victim following the crash. Notably, defendant was found on the lawn of the residence approximately 75 feet from the point of the initial impact and approximately 47 feet northwest of where the passenger compartment of the vehicle ultimately came to rest, while the victim was found in the middle of the road approximately 36 feet east of the passenger compartment of the vehicle.

Although the evidence placing defendant in the driver's seat on the night in question indeed was circumstantial, "[e]ven in circumstantial evidence cases, the standard for appellate review of legal sufficiency issues is whether any valid line of reasoning and permissible inferences could lead a rational person to the conclusion reached by the fact finder on the basis of the evidence at trial, viewed in the light most favorable to the People" (*People v Fomby*, 101 AD3d 1355, 1355 [2012] [internal quotation marks and citations omitted]). In our view, the foregoing evidence was more than sufficient to permit the jury to conclude that defendant was driving on the night of the accident. Additionally, although a different verdict would not have been unreasonable, we cannot say that the jury failed to accord the evidence the proper weight with respect to the issue of operation.

We reach a similar conclusion as to the issue of whether defendant recklessly caused the victim's death. Without belaboring the point, the record reflects that, following a day of heavy drinking,[12] defendant climbed behind the wheel of a vehicle and, with his pregnant girlfriend in the passenger seat, drove 76 miles per hour through a residential neighborhood having a posted speed limit of 30 miles per hour, at night, lost control of

---

**11.** Defendant's expert, who did not offer an opinion as to the identity of the driver, testified that defendant and the victim both were ejected upon the vehicle's impact with the first tree.

**12.** The fact that the jury opted to acquit defendant of driving while intoxicated in no way undermines the fact that defendant had been drinking since approximately 11:30 a.m. on the day of the accident, nor does it negate the fact that this was an alcohol-related crash (*see People v Asaro*, 21 NY3d 677, 685 [2013]).

the vehicle, left the traveled portion of the road and—without any evidence of braking—struck a tree with sufficient force to shear the tree from its trunk and sever the engine compartment of the Mitsubishi from the remainder of the vehicle. "Such proof permits the inference that defendant recklessly caused the death of another, either by consciously disregarding the substantial and unjustifiable risk that such result would occur or by being unaware of that risk solely by reason of [his] voluntary intoxication" (*People v DeLong*, 269 AD2d 824, 825 [2000], *lv denied* 94 NY2d 946 [2000] [citations omitted]). Under these circumstances, we have no difficulty in finding that the jury's verdict convicting defendant of manslaughter in the second degree is supported by legally sufficient evidence and is in accord with the weight of the evidence (*see People v Asaro*, 94 AD3d 773, 773 [2012], *affd* 21 NY3d 677, 685 [2013]; *People v Wolz*, 300 AD2d 606, 606 [2002], *lv denied* 1 NY3d 636 [2004]; *People v Hart*, 266 AD2d 698, 700-701 [1999], *lv denied* 94 NY2d 880 [2000]; *cf. People v Peryea*, 68 AD3d 1144, 1146-1147 [2009], *lv denied* 14 NY3d 804 [2010]; *People v DeLong*, 269 AD2d at 824-825; *People v Grenier*, 250 AD2d 874, 876-877 [1998], *lv denied* 92 NY2d 898 [1998]; *People v Kenny*, 175 AD2d 404, 406 [1991], *lv denied* 78 NY2d 1012 [1991]; *People v Verdile*, 119 AD2d 891, 892-893 [1986]).[13]

As for defendant's claim of prosecutorial misconduct, we note that defendant failed to object to the allegedly improper comments made by the prosecutor during the People's summation and, therefore, this issue is not preserved for our review (*see People v Mosher*, 94 AD3d 1231, 1233 [2012], *lv denied* 19 NY3d 999 [2012]; *People v Ciccone*, 90 AD3d 1141, 1145 [2011], *lv denied* 19 NY3d 863 [2012]). In any event, the challenged conduct "was not so egregious or pervasive as to deprive defendant of a fair trial" (*People v Muniz*, 93 AD3d 871, 876 [2012], *lv denied* 19 NY3d 965 [2012]; *see People v McCall*, 75 AD3d 999, 1002 [2010], *lv denied* 15 NY3d 894 [2010]).

We reach a similar conclusion regarding defendant's challenge to the supplemental jury instructions given by Supreme Court. After the jury retired, it requested a read back of the charge with respect to the first (aggravated vehicular homicide) and fourth (manslaughter in the second degree) counts of the

---

**13.** Although certain of the cited authorities indeed involve factual situations where the defendant was convicted of both manslaughter in the second degree and an alcohol-related offense, the foregoing cases nonetheless stand for the proposition that excessive speed coupled with alcohol consumption, failure to brake or take other corrective action and leaving one's lane of travel—all of which undeniably occurred here—are sufficient to support a finding of recklessness within the meaning of Penal Law § 15.05 (3).

indictment. Supreme Court complied with the request, and neither the People nor defendant voiced any objection with respect to the court's instructions. Thereafter, the jury requested a read back of "all charges . . . with specific clarification on the first and fourth" counts. Prior to rereading the applicable portions of its charge, Supreme Court—in an effort to provide the requested clarification—stated, "[W]hen you listen to the elements, you'll hear that[ ] aggravated vehicular homicide in the first degree[ ] has four elements, and the crime of reckless manslaughter in the second degree[ ] has two elements. So, you know that's the distinction. They're different from each other, that's why both of them are being submitted . . . and you are being asked to render verdicts on both." Although defendant objected to this "additional verbiage," he raised no other issue with respect to Supreme Court's response to the jury's request. Hence, defendant's present claim—that the supplemental instructions were either misleading or incomplete—has not been preserved for our review (*see People v Williams*, 28 AD3d 1005, 1009 [2006], *lv denied* 7 NY3d 819 [2006]). Nevertheless, "we are satisfied that the court appropriately interpreted the inquiry posed in this case and then meaningfully responded to it" (*People v Buckery*, 20 AD3d 821, 823 [2005], *lv denied* 5 NY3d 826 [2005] [citations omitted]).

Finally, we reject defendant's assertion that the verdict is repugnant. "[A] verdict as to a particular count shall be set aside [as repugnant] only when it is inherently inconsistent when viewed in light of the elements of each crime as charged to the jury" (*People v Tucker*, 55 NY2d 1, 4 [1981]; *accord People v Muhammad*, 17 NY3d 532, 539 [2011]; *see People v Brown*, 102 AD3d 704, 704 [2013], *lv denied* 21 NY3d 1014 [2013]; *People v Strickland*, 78 AD3d 1210, 1211 [2010]). Notably, we must "review the elements of the offenses as charged to the jury without regard to the proof that was actually presented at trial" (*People v Abraham*, 94 AD3d 1332, 1333 [2012], *lv granted* 19 NY3d 1100 [2012] [internal quotation marks and citation omitted]). Thus, "[i]f there is a possible theory under which a split verdict could be legally permissible, it cannot be repugnant, regardless of whether that theory has evidentiary support . . . . In this context, the apparently illogical nature of the verdict—as opposed to its impossibility—is viewed as a mistake, compromise or the exercise of mercy by the jury, none of which undermine[s] a verdict as a matter of law" (*People v Muhammad*, 17 NY3d at 540 [citations omitted]). In other words, although the jury's verdict may not logically make sense, all that is required is that the verdict is legally permissible.

Here, the jury acquitted defendant of aggravated vehicular

homicide (*see* Penal Law § 125.14 [3]), driving while intoxicated per se (*see* Vehicle and Traffic Law § 1192 [2]) and driving while intoxicated (*see* Vehicle and Traffic Law § 1192 [3])—all of which require proof of intoxication. Proof of intoxication, however, is not a prerequisite to a conviction of manslaughter in the second degree (*see People v Donnelly*, 103 AD2d 941, 942 [1984]); rather, all that is required is proof that the defendant recklessly caused the death of another (*see* Penal Law § 125.15 [1]). As the cited offenses are neither identical nor have the essential element of intoxication in common (*see People v Schaffer*, 80 AD2d 865, 866 [1981]), the verdict—although arguably illogical—is not repugnant under *People v Tucker* (*supra*) and *People v Muhammad* (*supra*) (*see People v Asaro*, 94 AD3d at 773; *People v Schaffer*, 80 AD2d at 866).

Defendant's remaining contentions, to the extent not specifically addressed, have been examined and found to be lacking in merit.

Lahtinen, J.P., Stein and Spain, JJ., concur. Ordered that the judgment is affirmed.

