*Nicholas Jabbar Williams v. State*, No. 1403, September Term, 2019. Opinion by Ripken, J.

**CRIMINAL LAW – VERDICT – LEGAL INCONSISTENCY**

Jury verdicts of not guilty of first-degree assault based on use of a firearm and guilty of second-degree murder are not legally inconsistent because the former is not a lesser-included offense of the latter.

**EVIDENCE – OPINION EVIDENCE – EXAMINATION OF EXPERTS**

The proponent of expert testimony bears the burden to establish, by a preponderance of the evidence, the reliability of an expert's methodology under Maryland Rule 5-702 as interpreted by the *Daubert* factors. Under *Rochkind v. Stevenson,* 471 Md. 1 (2020), a trial court may not rely solely on prior judicial acceptance of a scientific technique to establish its reliability.

**CRIMINAL LAW – EVIDENCE – SUFFICIENCY OF THE EVIDENCE**

In determining the sufficiency of the evidence, appellate courts look to all admitted evidence—whether admitted erroneously or not.

**CRIMINAL LAW – MOTIONS FOR NEW TRIAL – STATEMENTS, AFFIDAVITS, AND TESTIMONY OF JURORS**

Jurors generally cannot be heard to impeach their verdict.

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 1403

September Term, 2019

_____

NICHOLAS JABBAR WILLIAMS

v.

STATE OF MARYLAND

_____

Graeff,
Berger,
Ripken,

JJ.

_____

Opinion by Ripken, J.

_____

Filed: July 7, 2021

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

Nicholas Jabbar Williams ("Williams") appeals his convictions of second-degree murder, unlawful possession of a firearm by a person under twenty-one, and transporting a handgun in a vehicle. Following a jury trial in the Circuit Court for Charles County, Williams was sentenced to an aggregate of forty-eight years of incarceration with all but twenty years suspended.

Williams argues that his convictions should be vacated without retrial because the jury verdicts are legally inconsistent and the evidence was legally insufficient to support his convictions. Williams otherwise asserts that a new trial is necessary because of erroneously admitted testimony, including from the State's firearms examiner and two investigators, and improper jury deliberations. Williams alternatively seeks a limited remand in light of *Rochkind v. Stevenson*, 471 Md. 1 (2020), to determine the admissibility of the firearms examiner's expert testimony.

For the reasons discussed below, we remand the case for the circuit court to determine whether it would reach the same decision to admit the firearms examiner's testimony following the decision in *Rochkind*.

## FACTUAL AND PROCEDURAL BACKGROUND

### The Shooting

Cameron Townsend ("Townsend") was shot seven times in the intersection of Spruce Street and Holly Avenue in Waldorf, Maryland, on December 14, 2017. Residents of the neighborhood who were driving home discovered Townsend lying in the street and called 911. First responders were unable to resuscitate Townsend and pronounced him dead at 8:37 p.m.

The gunshots woke one resident of Holly Avenue that evening. He looked out his second-story window facing the intersection and saw a black car "facing up Spruce Street." A man was "standing beside it, and a body [was] laying on the ground beside him." The man "leaned down and almost touched the body, and asked him if he was alright." He jumped into the car and "took off as hard and fast as he could." The witness did not see or hear any other vehicles in the intersection after he heard the gunshots. The witness called 911.

Another resident of Spruce Street heard "five or six" gunshots that evening. He initially thought they came from the railroad tracks behind his house. He did not see anything behind his house or on Spruce Street and did not hear anything aside from the gunshots.

**The Investigation**

Based on interviews with Townsend's family, investigators learned that Townsend was with Williams on the day of the shooting. Townsend, Williams, Devin Hall ("Hall") and Justin Skinner ("Skinner") went to the District of Columbia for Townsend to sell shoes. Williams drove the group in his black Hyundai Accent. As they made their way to the shoe store, they stopped for Townsend to sell drugs. Townsend had a handgun with him in the car, which may have been stored in the center console or under a seat. Hall consumed Xanax pills and was heavily intoxicated by the time they reached the shoe store. Upon return to Maryland, Williams dropped Hall and Skinner off at Skinner's house around 8:00 p.m. Hall was so intoxicated that he needed to be carried inside. Williams and Townsend

left in Williams' car, with Williams still driving. Williams later told Skinner and Townsend's family that he dropped Townsend off at a liquor store in Waldorf.

The investigation at the crime scene uncovered three nine-millimeter cartridge cases. Investigators found a debit card, $850 in cash, and three plastic bags in Townsend's pockets. During an autopsy, a medical examiner recovered six bullets from Townsend's body. The medical examiner determined that three bullets directly penetrated Townsend's torso and four bullets entered his left arm before entering his chest and abdominal cavity. The wound paths were generally left to right, front to back, and downward.

On December 16, investigators executed a search warrant on Williams' home and car. Investigators found a fired nine-millimeter cartridge case between the windshield and dashboard of Williams' car. Forensic analysts observed holes in the front passenger seat, rear passenger seat, and in the rear passenger-side door. They recovered a bullet from the rear door. They determined that it was fired from the direction of the front left of the car and passed through the front and rear passenger seats before lodging in the rear door. A firearms examiner in the State's Firearms and Toolmarks Unit compared the markings on the bullet recovered from the car door and the bullets recovered from Townsend's body. The examiner determined that the bullets were fired from the same firearm. She also analyzed the cartridge case from Williams' car and the cases from the scene of the shooting. She determined that the cartridge cases were fired from the same firearm.

**Proceedings**

Williams filed a Motion in Limine to Exclude Firearms Identification Evidence under *Frye-Reed*[1] and Maryland Rule 5-702. He sought to exclude the firearms examiner's testimony altogether or, alternatively, to limit her testimony to her observations of the individual markings on the bullets and cartridge cases. The circuit court held an initial hearing to determine whether a full *Frye-Reed* hearing would be necessary. At the initial hearing, the court heard arguments on the motion and admitted reports about the scientific validity of firearms examination as well as the firearms examiner's report. No testimony was taken at the initial hearing. The court denied Williams' motion and declined to hold a full *Frye-Reed* hearing. The court did not make findings or set out its conclusions relating to Rule 5-702.

At trial, the State called the firearms examiner. Williams noted a continuing objection to her testimony under *Frye-Reed* and Rule 5-702 regarding the reliability of firearms analysis and whether the expert reliably applied the methodology to this case. She testified that firearms examiners first look to class characteristics such as the caliber of a bullet or firearm, rifling characteristics, and other intentional design features to determine whether ammunition components correspond to a certain firearm. Firearms examiners next look to individual characteristics—those "unique to a specific firearm." In her testimony, she described the basis of comparison between individual characteristics:

---

[1] This standard, which was applicable at the time of trial but is now defunct, takes its name from *Frye v. United States*, 293 F. 1013 (D.D.C. 1923), and *Reed v. State*, 283 Md. 374 (1978).

4

> During the manufacturing process . . . and through subsequent use and abuse, or rust or damage over time, there are microscopic imperfections or irregularities in the surfaces of the metal. And when a firearm is discharged, the pressure from the discharge forces the transfer of those microscopic imperfections from the firearm itself to the ammunition components such as bullets and cartridge case[s].

The examiner also testified about her conclusions that the recovered bullets were fired from the same firearm and the recovered cartridge cases were fired from the same firearm. She explained that firearms examiners "can't say, without a gun to link them, that a cartridge case and a bullet came from the same firearm."

The State also presented testimony from Detective Long, the lead investigator into Townsend's murder, and Master Corporal Shankster, another investigator. Detective Long testified about the investigation into Townsend's murder. On cross-examination, Williams' counsel questioned Detective Long about his interviews with Hall and Skinner and about a press release from the Sheriff's Department stating "no clear motive has been established" in Townsend's killing. On redirect examination, Williams objected as the State began to elicit testimony about possible motives developed in the investigation. The circuit court overruled the objection, and Detective Long described possible motives connected to Williams.

Master Corporal Shankster testified about photos taken during the search of Williams' bedroom. One of the Assistant State's Attorneys approached the bench and explained that he intended to ask Master Corporal Shankster about a photo depicting a bottle on Williams' dresser. Williams objected. The circuit court overruled the objection.

5

Master Corporal Shankster identified the bottle as Hoppe's Number Nine Gun Cleaner and Lubricant.

Following the State's case, Williams moved for a judgment of acquittal on all counts except transporting a handgun in a vehicle. Williams renewed the motion at the conclusion of the presentation of all evidence. Williams argued at both points that the evidence was insufficient to support the offenses charged. The circuit court denied both motions. The case was submitted to the jury.

The jury found Williams guilty of second-degree murder, possession of a firearm by a person under twenty-one, and transporting a handgun. Before hearkening the jury, Williams objected to the circuit court accepting the verdict, arguing that the verdict was legally inconsistent. Williams asked that the court send the jury back for further deliberation with instructions that if the jury believes Williams did not commit first-degree assault, they must acquit on second-degree murder. When the court declined, Williams moved for a mistrial on the second-degree murder charge. The circuit court determined that the verdict was supported by the evidence, denied Williams' motion, and accepted the jury's verdicts.

Williams filed a timely motion for a new trial under Maryland Rule 4-331(a). Williams contended that defense counsel communicated with jurors after the trial who stated that they did not think that Williams killed Townsend. Instead, per counsel's conversation, they thought Williams was "neglectful" in leaving the scene. Williams also asserted that a member of the jury mentioned Williams' decision not to testify during deliberations. Williams sought to support these allegations with a juror affidavit. The

circuit court sealed the affidavit, struck all mention of the jury's deliberation made in the courtroom, and denied the motion for a new trial. Williams appealed. Additional facts are supplied below.

## ISSUES PRESENTED FOR REVIEW

On appeal, Williams presents the following issues for our review:

I.      Did the trial court err by permitting the jury to return a legally inconsistent verdict and by failing to give additional instructions to the jury?

II.     Is [Williams] entitled to a new trial in light of the decision in *Rochkind v. Stevenson*? In the alternative, must this Court order a limited remand for proceedings to determine the admissibility of the challenged evidence under the [*Rochkind*] standard?[2]

III.    Did the trial court abuse [its] discretion by permitting the prosecution to elicit inadmissible hearsay during the testimony of Detective Long?

IV.    Did the trial court abuse [its] discretion by permitting Master Corporal Shankster to testify about a bottle found during a search of [Williams'] bedroom?

V.     Is the evidence legally insufficient to sustain [Williams'] convictions?

VI.    Did the trial court abuse discretion by denying [Williams'] motion for a new trial?

## DISCUSSION

**I.    THE JURY VERDICTS WERE NOT LEGALLY INCONSISTENT, AND NO ADDITIONAL JURY INSTRUCTIONS WERE REQUIRED.**

Williams argues that his jury verdicts were legally inconsistent because, in this case, first-degree assault is a lesser-included offense of second-degree murder. He argues that is so because, taking the bill of particulars and indictment together, his charges stem from a

---

[2] Our Issue II combines two of the questions presented in Williams' initial brief. The remaining issues are renumbered accordingly.

7

single act. He also argues that the jury verdicts were incompatible with the jury instructions and verdict sheet. The State argues that the verdicts are not legally inconsistent because the jury complied with the court's instructions, which contained different elements for first-degree assault and second-degree murder. We first provide additional background and second address Williams' legal contentions. As we explain below, the verdicts are not legally inconsistent.

### A.   The Jury Instructions and Verdicts

Williams was indicted for first-degree murder, use of a firearm in commission of a felony or crime of violence, first-degree assault, possession of a firearm by a person under twenty-one, and transporting a handgun in a vehicle. Williams filed a request for a bill of particulars.[3] The State responded and then amended its bill of particulars to specify that the basis of Williams' charges was his shooting Townsend seven times at the intersection of Spruce and Holly.

At the close of trial, the parties agreed that second-degree murder, as a lesser-included offense of first-degree murder, should be presented in the jury instructions. The circuit court instructed the jury to "consider each charge separately and return a separate verdict for each," except for the charge of use of a firearm in commission of a felony. If the jury were to find Williams not guilty of a felony charge—first-degree murder, second-

---

[3] Maryland Rule 4-202(a) requires that a charging document "contain a concise and definite statement of the essential facts of the offense with which the defendant is charged and, with reasonable particularity, the time and place the offense occurred." A defendant in circuit court may demand clarification on the charging document's essential facts through a written demand for a bill of particulars. Rule 4-241.

8

degree murder, or first-degree assault—it must also find him not guilty of the associated

use of a firearm charge for that felony.

The circuit court instructed the jury as follows on second-degree murder and first-

degree assault:

> Homicide[,] second-degree murder. Second-degree murder is the killing of another person with either the intent to kill, or the intent to inflict such serious bodily harm that death would be the likely result. Second-degree murder[] does not require premeditation or deliberation.
>
> In order to convict the defendant of second-degree murder, the State must prove, 1) that the defendant caused the death of Cameron Marcel Townsend, and 2) that the defendant engaged in the deadly conduct either with the intent to kill, or with the intent to inflict such serious bodily harm that death would be the likely result.[4]
>
> First-degree assault. The defendant is charged with the crime of first-degree assault. In order to convict the defendant of first-degree assault, the State must prove all the elements of second-degree assault, and also must prove that the defendant used a firearm to commit assault.[5]
>
> * * *
>
> Definition of assault. Assault is causing offensive physical contact to another person. In order to convict the defendant of assault, the State must prove 1) that the defendant caused physical harm to Cameron Marcel Townsend, 2) . . . that the contact was the result of an intentional or reckless act of the defendant and was not accidental, and 3) that the contact was not legally justified.[6]

Relevant here, the jury found Williams guilty of second-degree murder. It found

him not guilty of first-degree assault and use of a firearm in the commission of a felony as

---

[4] This instruction follows pattern instruction MPJI-CR 4:17.1 (2d ed., 2020 Supp.).

[5] This instruction follows pattern instruction MPJI-CR 4:01.1A.

[6] This instruction follows pattern instruction MPJI-CR 4:01(C).

9

to all three felonies. Williams objected to the jury verdicts before hearkening and requested that the jury be returned so that it may deliberate further on the second-degree murder charge. He argued that first-degree assault, of which he was acquitted, is a lesser-included offense of second-degree murder and that the jury verdicts were therefore legally inconsistent. The State responded to the objection by arguing that first-degree assault does not require the intent to kill. The circuit court found that the evidence supported the jury verdicts and declined to resubmit the issue to the jury.

### B. The Jury Verdicts Are Not Legally Inconsistent.

Whether a jury verdict is legally inconsistent is a question of law that we review without deference. *Givens v. State*, 449 Md. 433, 447–48 (2016). Legally inconsistent jury verdicts are not permitted in Maryland. *Price v. State*, 405 Md. 10, 29 (2008) (prohibiting inconsistent verdicts in criminal trials); *McNeal v. State*, 426 Md. 455, 471–72 (2012) (clarifying that *Price*'s prohibition applies to legally inconsistent verdicts, not factually inconsistent, illogical, or confusing ones). "[A] legally inconsistent verdict occurs where a jury acts contrary to a trial judge's proper instruction regarding the law." *McNeal*, 426 Md. at 466 (quoting *Price*, 405 Md. at 35 (Harrell, J., concurring)). As a matter of law, a verdict is legally inconsistent where a jury acquits on a charge that is "an essential element" of a charge on which they convicted. *Wallace v. State*, 219 Md. App. 234, 251 (2014) (quoting *McNeal*, 426 Md. at 458). "Expressed another way, legally inconsistent verdicts are those where a defendant is acquitted of a 'lesser included' crime embraced within a conviction for a greater offense." *McNeal*, 426 Md. at 458 n.1. An offense is considered a lesser-

10

included offense of another when all of its individual elements are contained in the other. *Abeokuto v. State*, 391 Md. 289, 353 (2006).

The prohibition on legally inconsistent verdicts ensures that a person is "not convicted of a crime on which the jury has actually found that the defendant did not commit an essential element, whether it be one element or all." *Wallace*, 219 Md. App. at 252 (quoting *Teixeira v. State*, 213 Md. App. 664, 680 (2013)). Our "[inconsistency] analysis requires that we review the elements of the offenses as charged to the jury without regard to the proof that was actually presented at trial." *Teixeira*, 213 Md. App. at 683 (quoting *People v. Muhammad*, 959 N.E.2d 463, 470 (N.Y. 2011)). "Any manner by which the jury strays from the prosecution's theory of the case, as presented in the indictment, leads us not to legal inconsistency but to factual anomalies."[7] *Id*. Our focus is not on the evidence "going into the jury," but on the presence or absence of elements "coming out of the jury." *Pitts v. State*, ___Md. App.___, No. 552, Sept. 2020 Term, 2021 WL 1686148 at *5 (Apr. 29, 2021).

The Court of Appeals revisited the law on legally inconsistent jury verdicts in *State v. Stewart*, 464 Md. 296 (2019). Despite a split decision, the Court ultimately retained the

---

[7] Factual anomalies in jury verdicts remain permissible in part because such anomalies may be the product of lenity. "A reviewing court, distanced from a jury, is equipped to evaluate independently the legal elements of charged crimes and make a determination as to whether the verdicts are compatible with these elements." *McNeal*, 426 Md. at 473. On the other hand, juries are the sole finder of fact and "may engage in internal negotiations, compromise, or even make mistakes; however, [judges] cannot divine whether the inconsistency is the product of lenity." *Id.* at 472. "To evaluate the considerations of the jury in reaching its verdict would involve pure speculation, or require a reviewing court to inquire into the details of the deliberations"—something courts cannot do. *Id.* at 473.

11

approach to legal inconsistency set out in *McNeal* and later cases, which we now apply. *See id.* at 310 (Watts, J., concurring in judgment); *id.* at 335–36 (Greene, J., concurring in part); *id.* at 342–43 (Hotten, J., dissenting).

Turning to Williams' case, we conclude that there is no legal inconsistency with the verdicts of not guilty of first-degree assault based on the use of a firearm and guilty of second-degree murder. The former is not a lesser-included offense of the latter. Initially, the parties do not contend—nor do we conclude—that the trial court incorrectly instructed the jury on the law. To determine whether first-degree assault based on use of a firearm is a lesser-included offense of second-degree murder, we compare the elements of each as set out in the jury instructions, criminal statutes, and case law.

We first consider the elements of first-degree assault. At the time of Williams' offenses and trial there were two different modalities for first-degree assault articulated in Maryland Code, Criminal Law Article ("CL") § 3-202(a) (2012 Repl.): "(1) A person may not intentionally cause or attempt to cause serious physical injury to another. (2) A person may not commit an assault with a firearm . . . ."[8] The circuit court instructed the jury on first-degree assault based on use of a firearm as follows: the State "must prove all the

_____

[8] CL § 3-202 was amended in 2020. The amendments reorganized specific aggravating criteria under subsection (b) and added an additional modality, numeral (b)(3), for first-degree assault: "A person may not commit an assault by intentionally strangling another." CL § 3-202(b) (2021 Repl.).

12

elements of second-degree assault, and also must prove that the defendant used a firearm to commit assault."[9]

We next consider the elements of second-degree murder, and we note that they do not include the use of a firearm. The circuit court's instruction on second-degree murder was: "the State must prove (1) that the defendant caused the death of Cameron Marcel Townsend, and (2) that the defendant engaged in the deadly conduct either with the intent to kill, or with the intent to inflict such serious bodily harm that death would be the likely result." Murder remains a common law offense. Second-degree murder is defined by statute as any murder not in the first degree. CL § 2-204 (2021 Repl.). The jury instruction matches the common law definitions relating to the two types of second-degree murder at issue here,[10] (1) "killing another person (other than by poison or lying in wait) with the

_____

[9] Williams points out that the circuit court's initial instructions to the jury included a definition of "serious physical injury" pertinent to the modality of first-degree assault in subsection (a)(1) based on the intent to cause serious physical injury. *See* CL § 3-202(a)(1). Although the circuit court's instruction on first-degree assault initially included an extraneous definition, it never instructed the jury that they could convict of first-degree assault based on intent to cause serious physical injury.

Initially, the court read the definitions from the pattern instruction on first-degree assault: "A firearm is a weapon that propels a bullet by gunpowder or similar explosive. Serious physical injury means injury that creates a substantial risk of death." *See* MPJI-CR 4:01.1A. The parties brought the extraneous definition to the circuit court's attention. The parties noted that they previously agreed that the definition should have been removed. After the circuit court reinstructed without the extraneous definition, the parties stated they were satisfied with the instruction.

[10] Here, neither the indictment—which followed the language in CL § 2-208(a)—nor the instructions limited the jury to consideration of second-degree murder only based on the intent to kill. *See Middleton v. State*, 238 Md. App. 295, 309–10 (2018) (noting that although the charging language in § 2-208(a) spells out first-degree murder, it includes second-degree murder based on the intent to cause grievous bodily harm).

13

intent to kill, but without the deliberation and premeditation required for first degree murder," and (2) "killing another person with the intent to inflict such serious bodily harm that death would be the likely result." *Burch v. State*, 346 Md. 253, 274 (1997).

Because first-degree assault based on use of a firearm contains an element that second-degree murder does not—the use of a firearm—the former is not a lesser-included offense of the latter. Indeed, the Court of Appeals has held that first-degree assault based on use of a firearm is not a lesser-included offense of second-degree murder. *Sifrit v. State*, 383 Md. 116, 138 (2004) ("[T]he use of a firearm . . . is not required for second-degree murder."); *see also Dixon v. State*, 364 Md. 209, 240–41 (2001) (noting that assault based on use of a firearm is not a lesser-included offense of attempted voluntary manslaughter because it does not require proof of use of a firearm).

Williams argues that the verdicts are legally inconsistent because, as in *Dixon,* there is ambiguity in the modality of first-degree assault that the jury relied on. He also suggests that the convictions may merge through application of the rule of lenity. First, in *Dixon*, the Court resolved ambiguity in the modality of a first-degree assault conviction in favor of the defendant and held the first-degree assault conviction merged with attempted manslaughter. 364 Md. at 248–49.[11] Here, there is no ambiguity regarding the modality of first-degree assault on which the jury relied. The jury could not have considered the intent-

---

[11] The modality of first-degree assault based on the intent to cause serious physical injury is a lesser-included offense of attempted manslaughter. *Dixon*, 364 Md. 238–41. *See also Middleton*, 238 Md. App. at 308–09 (holding first-degree assault based on the intent to cause serious physical injury is a lesser-included offense of second-degree murder based on an intent to inflict grievous bodily harm).

14

to-inflict-serious-physical-injury modality without disregarding the circuit court's instructions. *See State v. Sayles*, 472 Md. 207, 246 (2021) ("In Maryland, a jury is required to determine the facts and render a verdict based on the instructions on the law provided to it by the trial court."). Second, the rule of lenity—the rule that a person may not be convicted of two offenses growing out of the same act unless the legislature so intended—is not applicable. In *Sifrit*, the Court held that a conviction for first-degree assault based on use of a firearm would merge, according to the rule of lenity, with second-degree murder "for sentencing purposes." 383 Md. at 137–39. But the rule of lenity is not relevant here: Williams has not been convicted of two offenses that the legislature did not intend to punish separately. Rather, he was convicted of one offense with different legal elements than one of which he was acquitted.

Williams furthermore argues that his verdicts are legally inconsistent because the bill of particulars and indictment charge him with a single act that necessarily involved a firearm.[12] Based on the case presented at trial, we note that the jury's factual findings

---

[12] We also understand Williams to argue that a factual inconsistency becomes legal inconsistency where factually inconsistent verdicts are based on a single act. In support of this proposition, Williams relies on *Wallace*, in which this Court stated:

> If one criminal act gave rise to both charges, the jury's verdicts would be *legally* inconsistent because the jury, by acquitting him of second-degree assault, negated a necessary element of robbery. If, on the other hand, the jury was presented with two separate criminal acts, the verdicts would be, at most, factually inconsistent.

219 Md. App. at 253. This Court only considered whether the offenses in *Wallace* were part of the same criminal act because the parties agreed that second-degree assault is a

appear to be irreconcilable. Even so, the questions of whether Williams used a firearm to commit assault, used a firearm to commit murder, or committed murder were left to the jury as determinations of fact, and such factual anomalies do not lead to legal inconsistency. *See Teixeira*, 213 Md. App. at 683.[13] We cannot inquire into the jury's deliberations or potential exercise of lenity. The circuit court did not err in accepting the jury's verdicts or in declining to return the conviction of second-degree murder to the jury for further deliberation with additional instructions.

## II.  WE REMAND TO THE CIRCUIT COURT FOR THE LIMITED PURPOSE OF DETERMINING WHETHER THE FIREARMS EXAMINER'S TESTIMONY IS ADMISSIBLE UNDER *ROCHKIND*.

Williams filed his notice of appeal in September 2019, and it was pending at the time the Court of Appeals issued its August 2020 decision in *Rochkind v. Stevenson*, 471 Md. 1 (2020). The holding in *Rochkind* applies to cases pending on appeal that present the question, as this case does, of "whether a trial court erred in admitting or excluding expert testimony under Maryland Rule 5-702 or *Frye-Reed*." *Id*. at 39. The parties identify three potential appellate dispositions regarding Williams' challenge to the admissibility of the firearms examiner's testimony: reverse and remand for new pretrial proceedings and a new

---

lesser-included offense of robbery. *Id.* at 252. Here, first-degree assault based on the use of a firearm is not a lesser-included offense of second-degree murder.

[13] To the extent that Williams argues his conviction for second-degree murder is also inconsistent with acquittal for use of a firearm in the commission of a felony (for second-degree murder), we conclude those verdicts are not *legally* inconsistent for the same reasons as above.

16

trial, remand for the trial court to determine the admissibility of the examiner's testimony under *Rochkind*, or affirm.

Our decision here is guided by our standard of review. "The decision to admit or exclude 'expert' testimony is within the broad discretion of the trial court and that decision will be sustained on appeal unless it is shown to be manifestly erroneous." *Troja v. Black & Decker Mfg.*, 62 Md. App. 101, 110 (1985). "[E]ven with respect to a discretionary matter, a trial court must exercise its discretion in accordance with correct legal standards." *Alston v. Alston*, 331 Md. 496, 504 (1993); *see Aventis Pasteur, Inc. v. Skevofilax*, 396 Md. 405, 433 (2007) ("[A] failure to consider the proper legal standard in reaching a decision constitutes an abuse of discretion.").

We begin by providing additional background and reviewing the decision in *Rochkind*. Next, in analyzing the legal contentions, we first consider and decline Williams' request for reversal. Second, we consider and decline the State's request for affirmance. Third, because we cannot determine whether the circuit court abused its discretion under a standard that it did not consider, we order a limited remand for the circuit court to determine whether it would reach the same conclusions as to the admissibility of the firearms examiner's expert testimony post-*Rochkind*. In short, we cannot determine on appeal the extent to which the weight of prior decisions emphasized by *Frye-Reed* influenced the circuit court's reasoning or whether it might rule differently given the greater "flexibility" afforded under *Rochkind*.

## A.  Williams' Motion and the Expert's Trial Testimony

Williams filed a "Motion in Limine to Exclude Firearms Identification Evidence" regarding the firearms examiner's testimony and report under Maryland Rule 5-702 and *Frye-Reed*. He argued that the State did not meet its burden to show the reliability of firearms examination generally or as applied in this case. Williams questioned the scientific validity of firearms examination and argued that the examiner's report "consists of essentially conclusory statements, without an explanation of how the examiner reached the conclusions she did." He alternatively asked that if the circuit court were to admit some testimony, that it limit the examiner to "describing similarities" between the ammunition "without declaring that the spent ammunition was fired from the same gun" or a "specific gun."

The circuit court held an initial hearing to determine whether Williams' motion to exclude the expert report and testimony warranted a full *Frye-Reed* hearing. At this initial hearing, the State argued, among other things, that Maryland case law has previously accepted firearms examination and the expert's report was peer reviewed within the Firearms Examination Unit. Williams reiterated that the expert's conclusions were unexplained. Because the report did not include any analysis of individual markings, Williams argued, there was an "analytical gap" between the data and the examiner's conclusion that the bullets and cartridges can be matched to a unique firearm. Williams explained that to declare a match with a particular firearm, examiners must differentiate "subclass characteristics"—markings created by firearms manufactured on the same production line—from "individual characteristics"—markings unique to a particular

18

firearm. At the end of the hearing, the court admitted the expert's full report and three studies Williams relied on to challenge the field of firearms examination.

A week later, after considering the parties' arguments and reviewing the submitted studies, the circuit court denied Williams' motion to exclude the firearms report and testimony and declined to hold a full *Frye-Reed* hearing. The circuit court did not make findings or set out its conclusions relating to Rule 5-702.

At trial, the State called, among other witnesses, the firearms examiner. Prior to the examiner's testimony, Williams noted a continuing objection under *Frye-Reed* and Rule 5-702 regarding the reliability of firearms analysis and whether the expert reliably applied the methodology in this case. The examiner testified about her field and the results of her report and examination. She testified that she first examined the class characteristics of the recovered ammunition components. The cartridge cases were all nine-millimeter, brass with nickel primer, and marked with a Federal brand headstamp. The recovered bullets were all nine-millimeter Luger caliber.

The examiner testified that she next compared the recovered bullets and cartridge cases under a microscope. She explained that, during microscopic comparison, examiners analyze individual characteristics. She stated that the recovered bullets "were identified as having been fired from the same firearm." So too the "four fired cartridge cases were fired from the same firearm." Per her testimony, these conclusions were verified by a second firearms examiner.

Williams subjected the examiner to a lengthy cross-examination. The examiner testified that, in general, matching two bullets or cartridge cases to a specific firearm

requires finding that there is "sufficient agreement" between markings such that their overall similarity exceeds the level of similarity typically found between markings created by a "best known nonmatch[ing]" firearm. The examiner explained that practitioners in her field develop a general baseline for sufficient agreement by training to distinguish markings imparted by consecutively manufactured firearms. The examiner also testified that the rifling on the recovered bullets (a class characteristic) was a potential match to eighteen types of firearm. Williams' counsel asked the examiner to describe the specific markings she observed on the cartridge cases.[14] While she did not refer to specific markings, she did note that although there were some dissimilarities between the markings on the recovered cartridge cases, there was not "sufficient disagreement" between them.

**B.**     *Rochkind v. Stevenson*

In *Rochkind v. Stevenson*, the Court of Appeals adopted a simplified standard for admitting expert testimony. 471 Md. at 26. Under prior state law, trial courts were required to consider whether an expert's methods were "generally accepted" in the relevant scientific field under the *Frye-Reed* standard—named after *Frye v. United States*, 293 F. 1013 (D.D.C. 1923), and *Reed v. State*, 283 Md. 374 (1978)—as well as whether the expert's testimony satisfied the criteria in Rule 5-702. Noting that the jurisprudence developed under *Frye-Reed* had become "muddied" and duplicative, the Court announced

---

[14] Williams' counsel also asked the examiner about the specific findings in the "PCAST Report," one of the reports relied on in Williams' motion in limine, which concluded that the "foundational validity" of the field of firearms analysis had not been established. The examiner was familiar with the PCAST Report and responded that its findings have been rebutted by the professional association of firearms examiners, the DOJ, and the FBI.

that the evaluation of all expert testimony will now flow through Rule 5-702. *Rochkind*, 471 Md. at 26.[15] To guide Maryland courts implementing the rule, the Court adopted the factors and reasoning set out in *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579 (1993), *Gen. Electric Co. v. Joiner*, 522 U.S. 136 (1997), and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999). This line of cases implemented the federal counterpart to Rule 5-702 and focused inquiry "on the reliability of the methodology used to reach a particular result." *Rochkind*, 471 Md. at 31, 35–38.[16]

---

[15] Rule 5-702 remains: Expert testimony may be admitted in the form of opinion or otherwise if the court determines that the testimony will assist the trier of fact to understand the evidence or determine a fact in issue. In making that determination, the court shall determine (1) whether the witness is qualified as an expert by knowledge, skill, experience, training, or education, (2) the appropriateness of the expert testimony on the particular subject, and (3) whether a sufficient factual basis exists to support the expert testimony.

[16] *Rochkind* enumerates ten factors to guide a trial court's inquiry. They are:

(1) whether a theory or technique can be (and has been) tested;

(2) whether a theory or technique has been subjected to peer review and publication;

(3) whether a particular scientific technique has a known or potential rate of error;

(4) the existence and maintenance of standards and controls;

(5) whether a theory or technique is generally accepted;

(6) whether experts are proposing to testify about manners growing naturally and directly out of research they have conducted independent of litigation, or whether they have developed their opinions expressly for purposes of testifying;

(7) whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion;

(8) whether the expert has adequately accounted for obvious alternative explanations;

One of *Rochkind's* primary departures from *Reed*, as with *Daubert* from *Frye*, is in

declaring that trial courts may no longer rely entirely on stare decisis or judicial notice of

other courts' prior acceptance of certain methods or techniques:

> To the extent that *Frye-Reed* rulings were consistent, it is due to the ability
> of a later court to take judicial notice of a methodology's general acceptance.
> We reject this type of "consistency." Instead, we task trial courts with
> analyzing the reliability of testimony posed to it, without the notion that
> because a court has accepted it before, it shall be accepted again.

*Id.* at 37 n.16; *see United States v. Horn*, 185 F. Supp. 2d 530, 554 (D. Md. 2002) ("The

princip[al] shortcoming of *Frye* was that it excused the court from even having to try to

understand the evidence at issue."). The new standard "may mean, in a very real sense, that

'everything old is new again' with respect to some scientific and technical evidentiary

matters long considered settled." *Rochkind*, 471 Md. at 38 (quoting *Horn*, 185 F. Supp. 2d

at 554).

### C.  Reviewing the Challenged Expert Testimony

#### 1.  *We decline to reverse and order a new trial.*

First, we decline to reverse and remand for new pretrial proceedings and a new trial.

Williams argues that a new trial is automatically warranted because *Rochkind* represents a

---

(9)  whether the expert is being as careful as he [or she] would be in his [or her]
regular professional work outside his [or her] paid litigation consulting; and

(10)  whether the field of expertise claimed by the expert is known to reach reliable
results for the type of opinion the expert would give.

*Rochkind*. 471 Md. at 35–36. "A trial court may apply some, all, or none of the factors
depending on the particular expert testimony at issue." *Id*. at 37. "Vigorous cross-
examination, presentation of contrary evidence, and careful instruction on the burden of
proof [remain] the traditional and appropriate means of attacking shaky but admissible
evidence." *Id*. at 38.

substantial departure from prior jurisprudence and in denying Williams' motion, the circuit court necessarily employed the *Frye-Reed* standard. Contrary to Williams' argument, as was true prior to *Rochkind*, when a trial court admits expert testimony without adequately considering its reliability, reversal is not the automatic course of action. For example, in *Montgomery Mut. Ins. Co. v. Chesson*, 399 Md. 314, 331–36 (2007), a trial court neglected to hold a *Frye-Reed* hearing, but because the issues of scientific acceptance and a method's reliability were collateral to substantive trial issues, a limited remand under Rule 8-604(d) was appropriate. The Court of Appeals noted that "[v]erdicts should not be vacated unnecessarily . . . . Indeed, it would be a grave injustice were we to reverse the judgment and vacate the verdict, and then the trial court, after a *Frye-Reed* hearing, determined properly that [the expert's] testimony was generally accepted within the scientific community." *Id*. at 336; *see also Abruquah v. State*, 471 Md. 249, 250 (2020) (remanding "for the Circuit Court to consider whether, in light of [the Court of Appeals'] decision in *Rochkind v. Stevenson*, . . . the Circuit Court would reach a different conclusion concerning the admission of firearm and toolmark identification testimony . . . .").

Rather than creating an automatic rule, the reversal in *Rochkind* was driven by the case's unique procedural posture. The Court of Appeals' opinion in *Stevenson I*, an earlier decision in the matter, held that a medical doctor's expert testimony, which identified lead exposure as a general cause of ADHD and a specific cause of Stevenson's ADHD, suffered from an "analytical gap" because the expert relied on epidemiological studies that did not support her general theory of causation. *Rochkind v. Stevenson* ("*Stevenson I*"), 454 Md. 277, 295 (2017). The studies outlined a general causal relationship with attention deficits

and hyperactivity but not with clinical ADHD. *Id*. at 290. On remand, at the fourth damages trial in the matter, Rochkind sought to exclude the doctor's testimony—which "again rel[ied] solely on the [same] epidemiological studies"—concluding that lead exposure caused Stevenson's attention deficits and hyperactivity. *Rochkind*, 471 Md. at 9. The trial court misinterpreted the decision in *Stevenson I* to indicate that the testimony on general and specific causation was acceptable so long as it did not reference ADHD; in fact, *Stevenson I* did not reach the admissibility of testimony about specific causation. *Id.* at 26. Because of this misinterpretation, the circuit court failed to squarely address the analytical gap identified in *Stevenson I* and took the admissibility of the testimony for granted. *Id.* The same issue is not a factor in Williams' case.

Nor do we find any error in the firearms examiner's testimony that would prevent the circuit court from admitting the testimony after remand. In *Matthews v. State*, 249 Md. App. 509, 544 (2021), *cert. granted*, ___ Md. ___ (Jun. 22, 2021), this Court reversed a conviction after applying *Rochkind* on appeal because (like *Stevenson I*) it identified an analytical gap in an expert's conclusions. There, this Court concluded that a photogrammetry expert's analysis was based on incomplete information, which injected "incalculable uncertainty" into her analysis. *Id*. at 539. Rule 5-702 requires that a "sufficient factual basis exists to support the expert testimony." A sufficient factual basis requires, among other things, that the expert had an adequate supply of data to work from and that the expert's analysis employed a reliable methodology. *Matthews*, 249 Md. App. at 542–43. An analytical gap arises when the expert fails to adequately bridge the gap "between the data available to him and his ultimate conclusions." *Rochkind*, 471 Md. at

24

18. An expert's testimony may not be admitted when the expert's related conclusions suffer from an analytical gap.

We do not find an analytical gap on the record before us. The firearms examiner's report, admitted at the pretrial hearing, lists the evidence that the examiner reviewed. It noted that the recovered items were "microscopically inter-compared," discussed characteristics of the recovered items, and set out the examiner's conclusions. The examiner also testified at trial that her conclusions were verified by another examiner and described her training and the comparison process. The circuit court could find that the examiner had adequate information for the microscopic comparison analysis. On remand, however, the court should consider and make findings on whether there is an analytical gap.

### 2. *We decline to affirm Williams' convictions.*

Second, we decline to apply the new *Rochkind* standard to the record before us to affirm without remand. Although much of the Rule 5-702 analysis remains familiar, *Rochkind* "task[s] trial courts with analyzing the reliability of testimony posed to it[] without the notion that because a court has accepted it before, it shall be accepted again." 471 Md. at 37 n.16. Retroactive application of the new rule creates a situation—through no fault of the trial court—where it effectively failed to consider the proper legal standard, a standard which the Court of Appeals intended to give greater latitude to trial courts. *See id.* at 37 (discarding *Frye-Reed*'s de novo standard of review). As the State correctly pointed out at the initial hearing, *Reed* identified "ballistic tests" as a field whose reliability was subject to judicial notice, 283 Md. at 380, a ruling which this Court reiterated in

25

*Fleming v. State*, 194 Md. App. 76, 106–07 (2010) and in *Patterson v. State*, 229 Md. App. 630, 641–43 (2016).

The State argues that the circuit court appropriately considered the reliability of the expert's conclusions and did not reflexively admit the firearms identification evidence. However, the circuit court did not make explicit findings in its oral ruling denying Williams' motions, and we need not speculate about how the circuit court weighed the precedent on firearms examination under the *Frye-Reed* standard. The Court of Appeals' departure from the former standard warrants a ruling on the admissibility of the expert's testimony under the new, rebalanced standard. To be sure, trial courts may still look to prior decisions noting general acceptance in the relevant scientific community, but general acceptance is now only one factor among many others for assessing the reliability of an expert's methodology. *Rochkind*, 471 Md. at 35–36. The State suggests that *Matthews* serves as precedent for this Court to determine post-*Rochkind* admissibility without remand. *See Matthews*, 249 Md. App. at 542. Although we do not disagree conceptually, we find the analysis inapplicable here. Based on the reasoning in *Matthews*, the circuit court here could conclude that an adequate factual basis supports the testimony. In other words, a limited remand is appropriate.

We also cannot agree with the State that any error in admitting the firearms examiner's testimony is harmless as to Williams' convictions for second-degree murder, possession of a firearm by a person under twenty-one, and transporting a handgun in a vehicle. An error is harmless when an appellate court can declare a belief beyond a reasonable doubt, upon its review of the record, that the error in no way influenced the

26

verdicts. *Newton v. State*, 455 Md. 341, 353 (2017). The expert testimony could have affected all of Williams' convictions. The firearms examiner's trial testimony was unqualified. She testified that the recovered bullets "were identified as having been fired from the same firearm" and the "four fired cartridge cases were fired from the same firearm." The expert testimony had significant probative value, making it more likely that Williams was at the scene and that the bullet and cartridge case found in Williams' car were expended in Townsend's shooting. The charges are related: evidence supporting the theory that Williams committed a murder using Townsend's handgun necessarily also supports Williams' actual possession of a handgun and knowledge that there was a handgun in the car. We cannot say beyond a reasonable doubt that the jury would have returned the same verdicts absent the expert's testimony.

### 3. A limited remand is required under the circumstances.

Third, a limited remand will allow the trial court to determine whether it would admit the firearms examiner's testimony in the same form based upon the decision in *Rochkind*. Maryland Rule 8-604(d)(1) permits that if:

> [J]ustice will be served by permitting further proceedings, the Court may remand the case to a lower court. In the order remanding a case, the appellate court shall state the purpose for the remand. The order of remand and the opinion upon which the order is based are conclusive as to the points decided. Upon remand, the lower court shall conduct any further proceedings necessary to determine the action in accordance with the opinion and order of the appellate court.

The Court of Appeals has previously found it appropriate to remand for a trial court to determine the admissibility of firearms and toolmark examination testimony in light of

*Rochkind*. *Abruquah*, 471 Md. at 250 (remanding to this Court with instructions to remand to the trial court).

Accordingly, we remand to the Circuit Court for Charles County for the limited purpose of determining whether it would reach a different conclusion concerning the admission of firearms and toolmark identification testimony based on the hearing already conducted and such further proceedings, if any, that it deems necessary. The circuit court should set forth findings of fact and conclusions of law under the new standard. The circuit court should consider the challenged evidence in the posture of an initial determination on its admissibility for which the proponent bears the burden of proof by a preponderance of the evidence, rather than as a motion to exclude. Rule 5-104(a); *see Blackwell v. Wyeth*, 408 Md. 575, 585 (2009) ("[I]f the reliability of a particular technique cannot be judicially noticed, it is necessary that the reliability be demonstrated before testimony based on the technique can be introduced into evidence. . . . [T]his demonstration will normally include testimony by witnesses[.]" (quoting *Reed*, 283 Md. at 380)).

If the circuit court reaches a different conclusion as to the admissibility of the firearms examiner's testimony—either to exclude the testimony in whole or limit it as Williams alternatively requested—the circuit court must vacate Williams' convictions and grant a new trial as this Court concludes that those judgments could have been affected by the firearms examiner's testimony.

**III.** **THE CIRCUIT COURT DID NOT ABUSE ITS DISCRETION IN PERMITTING DETECTIVE LONG TO TESTIFY ABOUT POSSIBLE MOTIVES.**

Williams next argues that the circuit court abused its discretion by permitting the lead investigator in Townsend's murder, Detective Long, to testify about possible motives developed in the investigation. According to Williams, the testimony was unfairly prejudicial and constituted inadmissible hearsay. The State responds that Williams opened the door to Detective Long's discussion of motive and that no part of Detective Long's testimony was offered to prove the truth of the matter asserted. As explained below, we agree with the State on both points. We first provide additional background, second, explain why Detective Long's rebuttal testimony regarding motive was not unfairly prejudicial, and last, address whether his testimony constituted inadmissible hearsay.

**A.      Detective Long's Testimony**

The State called Detective Long to testify about the investigation into Townsend's murder. One of Williams' theories in the case was that the State's investigators mishandled the investigation by fixating on Williams at the expense of other leads, including failing to consider Townsend's illegal drug sales and plans to buy Percocet on December 14. During Williams' opening statement, Williams' counsel argued that "the police were still searching for a motive" after charging Williams: "They had no real notion of why someone like [Williams] would do such a thing," and "they started crafting a story to tell you during this trial." On cross-examination Williams' counsel questioned Detective Long about his interviews with Hall and Skinner and the development of potential motives in the investigation pointing away from Williams.

29

[DEFENSE COUNSEL]: Okay, you did not press [Townsend's brother], Justin Skinner, or Devin Hall for the specific names of the people who Cameron Townsend was beefing with?

[DETECTIVE LONG]: I pressed? What would you mean by press?

[DEFENSE COUNSEL]: Asked them.

[DETECTIVE LONG]: I did ask them. I did ask—

* * *

[DEFENSE COUNSEL]: So, Devin Hall told you he could think of people who wanted to shoot Cameron Townsend seven times, right?

Williams' counsel then used a transcript of Detective Long's interview with Hall to refresh Detective Long's recollection. Williams' counsel further questioned Detective Long about Hall's and Skinner's interview statements and asked whether Detective Long told Hall and Skinner that "[t]here was no doubt in [his] mind" that Williams was "responsible for [the murder]."[17] Williams' counsel asked Detective Long if Skinner suggested that the shooting might have been related to Townsend's plan to buy Percocet in Waldorf. Williams' counsel returned to the subject of motive in the following colloquy:

[DEFENSE COUNSEL]: Now, even after you spoke with Mr. Hall and Mr. Skinner, and did some initial investigation, you still were searching for some kind of motive in this case, right?

[DETECTIVE LONG]: I was asking . . . that was one of my questions, asking them, was for a reason? A reason behind this.

[DEFENSE COUNSEL]: And as of December 19th, you actually still had no motive in mind, is that correct?

[DETECTIVE LONG]: That would have been the day before meeting with Justin Skinner.

---

[17] Hall was not a witness at trial.

[DEFENSE COUNSEL]: Thank you. That is a good point.

[DETECTIVE LONG]: I was still . . . I was still asking questions about, you know, why somebody would do this?

[DEFENSE COUNSEL]: Well, the Sheriff's Office actually put out a press release on the 19th, saying there was no motive known at the time, right?

[DETECTIVE LONG]: I'm not aware . . . I don't . . . I don't put the press releases out. I don't know.

Williams' counsel showed Detective Long a press release from the Sheriff's Office. The cross-examination continued:

[DEFENSE COUNSEL]: Well, does that refresh your recollection as to the fact that you had no clear motive in mind?

[DETECTIVE LONG]: But . . . that is correct. So, it says, "No clear motive has been established." I mean, at that point, we are still . . . we still had not . . . we weren't confident in saying that there was . . . that that there was a motive. We were still developing information and learning information.

So, it wouldn't have been . . . that is common for a statement like that to have [been] published, where no[] clear motive had . . . that a clear motive had not been established, when it wasn't concrete yet.

On redirect, the State began to ask about motive and Williams' counsel objected. Williams' counsel argued that the foundation for Detective Long to discuss motive would rely entirely on testimonial hearsay. The State responded that Williams opened the door to discussion of motive. The circuit court overruled Williams' objection. The State then asked, "[D]id you develop possible motives to this homicide?" Detective Long discussed four potential motives which Williams now identifies as particularly problematic:

[DETECTIVE LONG]: We learned that Cameron Townsend should have been in possession of several thousand dollars.

* * *

When we found him, he only had $850 on his person.

31

* * *

[DETECTIVE LONG]: Additionally, there were . . . we knew that Cameron Townsend had been out . . . had been selling Xanax throughout the day. There were empty baggies in his . . . in his back pocket of his jeans. There was loose Xanax on the floor next to his . . . next to his seat. So, another possible motive would have been somebody taking, trying to take those pills from him.

We received information that Nicholas Williams had been looking for a gun.

* * *

[DETECTIVE LONG]: Alright. That he was . . . that he had been . . . that Nicholas Williams was looking for a firearm or tried to obtain one. We knew that [Townsend] had one with him that day, and once we located the vehicle and we processed the scene of the homicide, that firearm was not located.

* * *

[W]e learned that they had . . . as the four . . . as the group of them had been hanging out together, they were sort of cracking jokes on each other, but that [Williams] ended up being the butt of most of the jokes. And Devin Hall in particular said he had . . . he had really been giving [Williams] a hard time.[18]

Detective Long gave this testimony over continuing objection.

## B. The Circuit Court Did Not Abuse Its Discretion in Admitting Detective Long's Testimony.

### 1. Detective Long's testimony was not unfairly prejudicial.

Courts review de novo the question of whether a party opened the door to rebuttal evidence. *State v. Robertson*, 463 Md. 342, 353 (2019). "A secondary inquiry regarding the proportionality of a party's rebuttal evidence is a separate issue that we review for abuse of discretion." *Id.* at 367. "Abuse of discretion [exists] where no reasonable person would

---

[18] On re-cross-examination it was clarified that "he" referred to Hall. As in, Hall, not Townsend, was giving Williams a hard time.

take the view adopted by the [trial] court, or when the court acts without reference to . . . guiding rules or principles." *Id*. at 364.

Evidence admitted at trial must be relevant, and its danger of unfair prejudice may not substantially outweigh its probative value. Md. Rules 5-402–403. The open door doctrine "authorizes admitting evidence which otherwise would have been irrelevant in order to respond to . . . admissible evidence which generates an issue." *Little v. Schneider*, 434 Md. 150, 157 (2013). The doctrine "is based on principles of fairness and serves to balance any unfair prejudice one party may have suffered." *Robertson*, 463 Md. at 351–52 (internal quotation marks omitted). Parties may "meet fire with fire" in introducing otherwise inadmissible rebuttal evidence. *Id.* at 352.

In *State v. Robertson*, Robertson was on trial for charges related to a fatal stabbing. 463 Md. at 346. On direct examination, Robertson's counsel asked him whether he had ever been in "any kind of trouble." *Id.* at 358–59. He answered that he had not. *Id.* at 359. This line of questioning opened the door for the State to introduce proportional evidence to rebut the image of Robertson as an "upstanding individual[.]" *Id.* at 360. On cross-examination, the State repeatedly questioned Robertson on the specifics of an unrelated prior incident that he was involved in where his friend brandished a knife during a fight. *Id.* at 362. The Court of Appeals held that the trial court erred because it "failed to interject in the State's repeated inquiries that elicited details about the prior occurrence." *Id*. at 364. "[The State's] use of rebuttal evidence was not a proportional response to the general good character that defense counsel painted." *Id*. at 365.

Similarly, in *Khan v. State*, Khan was charged with offenses for inappropriately touching two girls who entered the store where he worked as a security guard. 213 Md. App. 554, 561 (2013). Khan's counsel opened the door to questions about a prior incident in the workplace—where a customer alleged that Khan inappropriately touched her—by asking Khan's former supervisor whether she was satisfied with his work "overall." *Id.* at 572–76. The State asked the former supervisor about the incident and posed similar questions about the complaint to Khan's wife and son who testified about Khan's character for truthfulness. *Id.* at 574–75. The State also asked Khan if he remembered a conversation about the customer's complaint. *Id.* at 565. This Court held:

> While the proverbial door was opened to the disputed testimony, it *remained for the trial court to balance its probative value against its prejudicial nature*, *see* Rule 5-403, and here we see no abuse of discretion. The evidence in question was not presented to prove that an untoward incident actually had occurred, and the complaint's substance was never addressed in detail. The testimony elicited from [Khan's supervisor] during the State's redirect examination was narrowly tailored to respond to her testimony during the defense's cross-examination.

*Id.* at 575 (emphasis changed).

In accordance with these principles, we conclude that a trial judge could reasonably find that the testimony that the State elicited during Detective Long's redirect examination was proportional to the issues generated on cross-examination. The parties agree that Williams' counsel opened the door to evidence about possible motives uncovered in the investigation; however, Williams argues that Detective Long's rebuttal testimony should have been limited because of the risk of unfair prejudice. During cross-examination, continuing a theme expressed in Williams' opening statement, Williams' counsel

34

questioned Detective Long about the press release stating that the Sheriff's Office did not have any "established motive." Williams' counsel also questioned Detective Long about other possible motives arising in interviews with Hall and Skinner that pointed away from Williams—namely whether the killing could have been related to an illegal drug transaction. The initial line of questioning here was much more specific than the initial questions in *Robertson* and *Khan*. The issues Williams generated were not about the defendant's general character traits, as in *Robertson* and *Khan*, but raised questions about the focus and efficacy of the murder investigation. These issues were not brought up during direct examination, so, as the circuit court noted, Williams' line of questioning "opened the door."

To effectively address these issues, a trial judge could reasonably find it necessary to admit details of possible motives connecting back to Williams. After defense counsel's extensive questioning and reference to the press release, limiting Detective Long's testimony to a general assurance that the investigation in fact developed some motives without identifying them—as Williams suggests should have occurred—would not have given the State a fair opportunity to respond.[19] Furthermore, the rebuttal testimony was

---

[19] Williams argues that the holding in *Robertson* flatly prohibits the elicitation of specific details about potentially sensitive subjects as rebuttal evidence. We disagree. *Robertson* and *Khan* dealt with rebuttal evidence of prior bad acts, which very closely resembled the charged crime and was elicited to rebut evidence of the defendant's general good character. *Robertson*, 463 Md. at 362–63; *Khan*, 213 Md. App. at 564–65. Accordingly, the elicitation of details about prior bad acts is not necessary to rebut evidence of a defendant's good character. Bad acts evidence carries a high risk of creating an impression of the defendant's propensity toward that act. Contrary to Williams' argument, as *Khan* holds, the ultimate touchstone for rebuttal evidence is the familiar balance between relevance and risk of unfair prejudice. *Khan*, 213 Md. App. at 573–74.

proportional to the issues generated. The circuit court permitted the State to elicit information about *possible* motives. Detective Long explained on cross-examination that motives develop as an investigation progresses even when such theories are "not concrete yet." Like the rebuttal in *Khan*, Detective Long's testimony was offered to place earlier testimony in context, not to prove a fact (or, here, to prove Williams acted with an *actual* motive). Many of the themes set out in the possible motives discussed—that Townsend had a significant amount of money on him, Townsend had been selling illegal drugs, and Williams was the subject of occasional joking—had been raised at earlier points in the trial. Although Williams' desire to obtain a firearm had not previously been discussed, that possible motive was not emphasized in the State's closing argument, did not fit with the evidence—Townsend's handgun was not recovered—and is a relatively weak motive to support murder. Williams' counsel addressed these motives on re-cross-examination and substantially challenged Hall's credibility, especially relating to the events of December 14. Finally, the circuit court prevented Detective Long's rebuttal testimony from entering unfairly prejudicial topics relating to motive: the circuit court sustained an objection as Detective Long began to mention the names of Williams' social media accounts.

Considering the issues generated on cross-examination and the effect of the rebuttal testimony, the circuit court did not act without regard for its duty to balance the probative value of such testimony against the risk of unfair prejudice. The circuit court did not abuse its discretion.

## 2. *Detective Long's statements were not hearsay.*

Second, Detective Long's rebuttal testimony was not hearsay because it was not offered for the truth of the matter asserted. Courts determine de novo whether evidence constitutes inadmissible hearsay. *Parker v. State*, 408 Md. 428, 436 (2009). Hearsay is an out of court statement offered into evidence to prove the truth of the matter asserted. Rule 5-801(c); *id.* at 436. Hearsay is not admissible unless it fits into an established exception. Rule 5-802.

Initially, Williams identifies four statements within Detective Long's redirect examination as hearsay:

(1)  We learned that Cameron Townsend should have been in possession of several thousand dollars.

(2)  Another possible motive would have been somebody taking, trying to take those [Xanax] pills from him.

(3)  We received information that Nicholas Williams had been looking for a gun.

(4)  [Williams] ended up being the butt of most of the jokes. And Devin Hall in particular said [Hall] had . . . he had really been giving [Williams] a hard time.

As discussed above, Detective Long made these statements describing possible motives after lengthy cross-examination by Williams' counsel that drew heavily from excerpts of Detective Long's interviews with Hall and Skinner. The State elicited these statements to counter the impression that the murder investigation had not developed any motives and that the investigation focused tightly on Williams without considering other leads. During his cross-examination, Detective Long explained that investigators continually develop such possible motives as they glean new information. Accordingly, these four statements

37

regarding possible motives were not offered to establish second-hand assertion as fact. They were not offered for the truth of the matter asserted.[20] We conclude that the statements were not hearsay.

## IV. THE CIRCUIT COURT DID NOT ABUSE ITS DISCRETION IN ADMITTING TESTIMONY REGARDING THE PHOTO OF GUN CLEANER.

Williams argues that the circuit court abused its discretion in permitting Master Corporal Shankster, one of the State's investigators, to testify that a photo he took in Williams' bedroom depicted a bottle of gun cleaner. According to Williams, permitting this testimony was error because the bottle was not identifiable from the photo and Master Corporal Shankster may not have had personal knowledge about the item. The State responds that the evidence was relevant and not unfairly prejudicial. We first provide additional background and then consider whether the circuit court erred in admitting the challenged testimony.

### A.     Master Corporal Shankster's Testimony

Master Corporal Shankster took a series of photos while executing a search warrant on Williams' home that, at trial, were admitted into evidence without objection. At a bench conference, an Assistant State's Attorney explained that one of the photos depicts a bottle of gun cleaner and lubricant—a bottle with an orange cap—atop Williams' dresser and he

---

[20] The State also argues that the open-door doctrine permits hearsay be admitted in this instance because discussion of motive necessarily requires obtaining information from other sources. In *Clark v. State*, the Court of Appeals noted that the open-door doctrine admits incompetent evidence (evidence that is not admissible for reasons other than relevancy) only in response to similar incompetent evidence that was admitted *over objection*. 332 Md. 77, 87 (1993).

intended to ask Master Corporal Shankster to identify the bottle. The Assistant State's Attorney stated that he had identified the bottle in other photos that were turned over to Williams in discovery and "looked up" the bottle and its contents. Williams' counsel objected to testimony identifying the gun cleaner because the bottle's label was not visible in the admitted photo and no information identifying the bottle had been provided to Williams. Williams' counsel confirmed that Williams had received other photos depicting the bottle during discovery. The circuit court overruled Williams' objection. Master Corporal Shankster proceeded to describe the bottle in the photo: it was a "bottle of Hoppes Number Nine Gun Cleaner and Lubricant," an oil for cleaning and lubricating firearms.

### B. The Testimony Was Relevant and Not Unfairly Prejudicial.

We determine whether evidence is relevant as a matter of law, for which the standard of review is de novo. *Perry v. Asphalt & Concrete Servs.*, 447 Md. 31, 48 (2016). The balancing of probative value against unfair prejudice and other factors "is committed to the considerable and sound discretion of the trial court and reviewed under an abuse of discretion standard." *Id.* (internal quotation marks omitted).

Lay witness testimony must be relevant and based upon personal knowledge. Rules 5-402, 602. "'Relevant evidence' means any evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Rule 5-401. Relevant "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of

undue delay . . . ." Rule 5-403. "Evidence to prove personal knowledge may, but need not, consist of the witness's own testimony." Rule 5-602.

Williams' possession of gun cleaner clears the threshold of relevance, as it at least tends to show a familiarity with firearms. Williams suggests that it is not clear that Master Corporal Shankster's testimony was based on his personal knowledge. This argument is unavailing. Master Corporal Shankster responded to the State's open-ended question. Williams' counsel did not question Master Corporal Shankster about the basis of his answer or raise concerns about the witness's personal knowledge at the bench conference. We cannot conclude, as Williams urges, that Master Corporal Shankster had no personal knowledge about the bottle or its contents. Any prejudicial effect of the testimony was minimal and did not substantially outweigh its probative value. We conclude that the circuit court did not abuse its discretion in admitting this testimony.

## V.     THE EVIDENCE IS LEGALLY SUFFICIENT TO SUSTAIN WILLIAMS' CONVICTIONS.

Williams challenges the sufficiency of the evidence to sustain his convictions for second-degree murder and possession of a firearm by a person under twenty-one.[21] The State argues that the evidence is sufficient to sustain the convictions. We first summarize the evidence and then explain that it was legally sufficient to sustain the convictions.

---

[21] When a conviction is reversed for insufficiency of the evidence, the defendant may not be retried due to the prohibition on double jeopardy found in the Fifth Amendment of the U.S. Constitution and Maryland common law. *Ware v. State*, 360 Md. 650, 708 (2000).

## A. The Evidence

Detective Long testified that Williams owned and drove a black Hyundai Accent, pictures of which the State moved into evidence. Skinner testified that on December 14, 2017, Williams drove Townsend, Hall, and Skinner to a shoe store in Washington, D.C., for Townsend to sell shoes. Townsend was also making drug sales throughout the day. Townsend had a handgun, which Skinner touched at some point while in the car, and which "could have been . . . under a seat or in the center console . . . ." After stopping at a gas station, Williams dropped Hall and Skinner off around 8:00 p.m. and continued alone with Townsend. Skinner did not see any bullet holes in the seats or door of Williams' car when he was dropped off.

One resident of Holly Avenue testified that he heard gunshots around 8:30 p.m. and looked out his window to see a man next to a black car. He described the man as standing over another person—who first responders later identified as Townsend—on the ground. According to the witness, the man leaned down, almost touching Townsend, and asked him if he was alright. The man jumped into the car and sped away. Another neighbor heard "five or six gunshots" around that time.

First responders attempted to aid Townsend but, failing to detect a pulse, declared him deceased at 8:37 p.m. The assistant medical examiner who conducted an autopsy testified that Townsend was hit with seven bullets; she recovered six bullets from Townsend's body. She testified that four of the gunshot wounds were "rapidly fatal." One bullet hit the base of his spinal column, which would have been immobilizing. The wound

41

paths were generally from left to right, front to back, and slightly downwards. Four bullets entered Townsend's left arm before penetrating his torso.

Detectives testified about physical evidence recovered from Williams' car, bedroom, and the scene of the shooting. Investigators recovered three nine-millimeter cartridge cases from the scene and one from Williams' car. The firearms examiner testified that the cartridges were all fired from one gun. Forensic analysts who processed the car recovered a nine-millimeter bullet from the rear passenger-side door. According to the firearms examiner, the bullets were also fired from one gun. Analysts observed bullet holes in the front and rear passenger seats. Using a trajectory rod, they determined that the bullet lodged in the door was fired from the direction of the front left of the car and passed through the front and rear passenger seats. Photos of the trajectory rod analysis were entered as evidence. Investigators discovered a substance that was likely blood on the driver-side floormat. They also discovered a substance that was likely blood on the heel of one of Williams' shoes. The substance was invisible to the naked eye. Townsend could not be excluded as a significant contributor to the DNA profiles recovered from the substances.

Williams returned home on the evening of December 14 before 9:00 p.m. and did not park in front of his home. Detectives ultimately found his car on December 16 after Williams moved the car to a spot in front of his home that morning. Williams' mother told detectives that it was unusual for him not to park in front of his home or at a nearby lot. The day after the shooting, Williams stayed home all day and cleaned his bathroom with bleach. The bleach odor was so strong that Williams' mother asked him to turn on the bathroom exhaust fan. Williams' mother told detectives that it was unusual for Williams

42

to stay home all day and unusual for him to clean the bathroom with bleach. Skinner eventually learned of Townsend's death when he spoke to Williams over the phone on December 15. Williams told Skinner that he had dropped Townsend off at a liquor store in Waldorf at 7:00 p.m. Skinner found this strange because the group was still driving together at that time. Williams also told Townsend's mother and brother that he dropped Townsend off at a liquor store in Waldorf.

## B. The Evidence is Sufficient to Support the Convictions.

"In reviewing the sufficiency of the evidence to sustain a criminal conviction," appellate courts must "determine 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Taylor v. State*, 346 Md. 452, 457 (1997). "Maryland has long held that there is no difference between direct and circumstantial evidence." *Hebron v. State*, 331 Md. 219, 226 (1993). A conviction may be sustained on the basis of "a single strand" or "successive links" of circumstantial evidence, *id.* at 228, so long as the circumstances, taken together, support an inference of guilt beyond a reasonable doubt, *Taylor*, 346 Md. at 458. Such inferences "must rest upon more than mere speculation or conjecture." *Smith v. State*, 415 Md. 174, 185 (2010). "We do not second-guess the jury's determination where there are competing rational inferences available." *Id.* at 183.

In considering Williams' challenge to the sufficiency of the evidence, we analyze all of the evidence—admitted erroneously or not—presented at trial. *Lockhart v. Nelson*, 488 U.S. 33, 40–42 (1988); *see also Purnell v. State*, ___Md. App.___, No. 355, Sept. 2019

43

Term, 2021 WL 2149761 at *3 (May 27, 2021) (noting that the issue of legal sufficiency

"deal[s] only with the satisfaction of the burden of production."). Even though remand is

required to determine the admissibility of the challenged expert testimony described in

Section II above, the admissibility of that evidence does not factor into our analysis.[22]

A finding that Williams shot Townsend to death with Townsend's handgun would

satisfy the essential elements of both convictions. The elements of second-degree murder

are (1) that the defendant caused a person's death and (2) that the defendant engaged in

deadly conduct either with the intent to kill or with the intent to inflict such serious bodily

harm that death would be the likely result. *See Burch*, 346 Md. at 274. The elements of

possession of a firearm by a person under twenty-one are (1) that the defendant knowingly

possessed a regulated firearm and (2) that the defendant was under twenty-one years of age

at the time of that possession, where possession means actual or indirect control. Md. Code,

Public Safety Article ("PS") § 5-133(d) (2011 Repl., 2015 Supp.).[23] A handgun is a

---

[22] This is because reversal for evidentiary insufficiency "is in effect a finding that the government . . . failed to prove its case" but reversal for erroneously admitted evidence "implies nothing with respect to the guilt or innocence of the defendant," only that he was "convicted through a judicial *process* which is defective in some fundamental respect." *Lockhart*, 488 U.S. at 40 (internal quotation marks omitted). "[R]eversal for insufficiency of the evidence should be treated no differently than a trial court's granting a judgment of acquittal at the close of all the evidence," at which the trial court reviews all admitted evidence. *Id.* at 41.

[23] Section 5-133 was amended in 2018 without substantive changes to subsection (d). PS § 5-133(d) (2018 Repl.).

regulated firearm. PS § 5-101(r)(1) (2011 Repl., 2017 Supp.).[24] Shooting someone to death establishes possession through actual control. Because, as Williams' mother's testimony established, Williams was under twenty-one at the time of the shooting, the main question is whether a reasonable jury could have found that Williams shot Townsend with a handgun. We conclude that they could have.

The evidence was sufficient for a reasonable juror to conclude that Williams shot Townsend with the gun that Townsend had in the car. The evidence supports the inference that Townsend was shot in Williams' car: detectives recovered bullets and cartridge cases from the car, forensic analysts found bullet holes in the car's interior, and a witness saw Townsend lying on the ground next to a car of matching description. The evidence supports the inference that Williams shot Townsend: Williams had been in the driver's seat to Townsend's left, Townsend's bullet wounds were from left to right, the trajectory of the bullet lodged in the rear door traced back to the area of the car's front left, and Williams could have had access to Townsend's handgun. The evidence furthermore supports the inference that Williams was the only person who could have shot Townsend: Williams was alone with Townsend when leaving Skinner's house, Williams was alone in the street with Townsend shortly after the shooting, and witnesses did not report anyone else present at or fleeing from the scene. Relatedly, in closing argument, the State invited the jury to infer that Williams stepped out of the car before shooting back in at Townsend. Based on the

---

[24] Section 5-101 was amended in 2019 without substantive changes to subsection (r). PS § 5-101(r) (2018 Repl., 2019 Supp.).

photographs of the trajectory rod analysis presented to the jury, the State argued that the bullet that lodged in the rear door passed directly through the area where the driver, Williams, would have been sitting. Therefore, the State argued, if an unidentified third person had shot Townsend—as Williams suggested at trial—Williams would also have been hit with gunfire. Because Williams was not hit, the argument goes, he must have been the shooter. The jury could also have accepted the State's argument that Williams sought to cover up his involvement in the shooting based on the evidence that Williams claimed to have parted ways with Townsend earlier and that Williams attempted to remove potential DNA evidence with bleach. To be sure, there is other evidence weighing against each of these inferences, but we will not "second-guess the jury's determination where there are competing rational inferences available." *Smith*, 415 Md. at 183. We hold the evidence was sufficient to support Williams' convictions.

## VI. THE CIRCUIT COURT DID NOT ABUSE ITS DISCRETION IN DENYING WILLIAMS' MOTION FOR A NEW TRIAL BASED UPON IMPROPER JURY DELIBERATIONS.

Last, Williams argues that the circuit court erred in denying his motion for a new trial. He accepts the general prohibition on impeaching jury verdicts but asks this Court to adopt a rule permitting impeachment where juror conduct "casts serious doubt on the fairness and impartiality of the jury deliberations and the resulting verdict." Specifically, he asks that we expand the narrow exception that the United States Supreme Court created in *Pena-Rodriquez v. Colorado*, 137 S. Ct. 855 (2017). We decline to do so. Before addressing his legal contentions, we first provide additional background.

46

## A. The Motion for a New Trial

Williams moved for a new trial under Rule 4-331(a) because his verdicts were legally inconsistent and, in conversation with jurors following the trial, his counsel believed that the jury had misunderstood and misapplied the law. Williams argued that the jury did not in fact believe that he killed Townsend but rather only that he was neglectful in failing to render aid and fleeing from the scene. And, Williams argued, the jury improperly discussed his decision not to testify. Williams supported his motion with a juror affidavit repeating the information about deliberations that were relayed to defense counsel. The circuit court struck all mention of juror deliberations, sealed the affidavit, and denied Williams' motion for a new trial.

## B. The Circuit Court Did Not Abuse Its Discretion in Denying the Motion for a New Trial.

This Court reviews a denial of a motion for a new trial for abuse of discretion. *Williams v. State*, 462 Md. 335, 344 (2019). Under Maryland Rule 4-331(a) "[o]n motion of the defendant filed within ten days after a verdict, the court, in the interest of justice, may order a new trial." To reverse a trial court for denial of a motion for a new trial, the appellate court "must find that the degree of probable prejudice [was] so great that it was an abuse of discretion to deny a new trial." *Williams*, 462 Md. at 345 (internal quotation marks omitted).

The secrecy of jury deliberations is fundamental to the jury's role. *Sayles*, 472 Md. at 232–33. Accordingly, "jurors cannot be heard to impeach their verdict." *Colvin-el v. State*, 332 Md. 144, 184 (1993). Rule 5-606(b) prohibits attacking a valid verdict through

47

evidence of "any matter or statement occurring during the course of the jury's deliberations" or through a "juror's mental processes in connection with the verdict," including through a juror's affidavit. A jury is presumed to have followed their instructions given by the trial court, including the instruction to not consider the defendant's decision to not testify. *Dorsey v. State*, 185 Md. App. 82, 110 n.8 (2009).

The circuit court did not abuse its discretion in denying the motion for a new trial because the motion's substance and supporting affidavit are plainly prohibited by Rule 5-606(b).[25] Williams' motion and the affidavit reference the juror's understanding of the intent and causation elements of second-degree murder and the basis for the belief that Williams was merely "neglectful" in causing Townsend's death—all of which encompass a juror's mental processes or explicit statements made during deliberation. Trial courts cannot scrutinize jury deliberations in the way that Williams requested, and such scrutiny cannot be the basis for a new trial under Rule 4-331.

Despite the general prohibition on impeaching verdicts with juror testimony, the United States Supreme Court has held that the Sixth Amendment permits courts to consider evidence offered to impeach a jury verdict where "a juror makes a clear statement that indicates he or she relied on racial stereotypes or animus to convict a criminal defendant[.]" *Pena-Rodriguez*, 137 S. Ct. at 869. The Court's narrow holding recognized that attempts to rid juries of every manner of irregularity through impeachment would "expose [the jury

---

[25] Williams' motion for a new trial also reiterated his arguments that the jury's verdicts are legally inconsistent. Because they are not, as discussed in Section I above, the circuit court did not abuse its discretion in denying the motion on that basis.

system] to unrelenting scrutiny" and "[i]t is not at all clear . . . that the jury system could survive such efforts to perfect it." *Id.* at 868. Distinct from other sorts of troubling behavior, "racial bias implicates unique historical, constitutional, and institutional concerns" such that barring corrective action through the impeachment rule "would risk systemic injury to the administration of justice." *Id.*

Williams' efforts to impeach his jury verdict do not fall within this Sixth Amendment exception: he does not allege that any of the jurors' statements indicated they were driven by racial animus. We decline Williams' invitation to expand the exception to apply to the impeachment evidence he offered below. Accordingly, we conclude that the circuit court did not abuse its discretion in denying Williams' motion for a new trial.

**REMANDED TO THE CIRCUIT COURT FOR CHARLES COUNTY PURSUANT TO MARYLAND RULE 8-604(d), WITHOUT AFFIRMANCE OR REVERSAL, FOR ADDITIONAL PROCEEDINGS AS SET FORTH IN THIS OPINION. COSTS TO BE DIVIDED EVENLY BETWEEN APPELLANT AND CHARLES COUNTY.**